## NATIONAL LABOR RELATIONS BOARD v. STAR PUB. CO.

### No. 8746.

Circuit Court of Appeals, Ninth Circuit.
June 14, 1938.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, all of Washington, D. C.,

Allen Heald, of Chicago, Ill., and G. L. Patterson, of Seattle, Wash., for petitioner.

S. S. Hahn, of Los Angeles, Cal., and Bayley & Croson, of Seattle, Wash., for respondent.

Vanderveer & Bassett, of Seattle, Wash., for intervener.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

The National Labor Relations Board has petitioned us for the enforcement of its order directing respondent, Star Publishing Company, to cease and desist from doing certain acts, and to take affirmative action.

Before relating the board's finding, certain facts appearing in a pleading filed with the Board will explain the relationship between the unions involved.

The American Federation of Labor, a voluntary association, hereinafter called the Federation, is a labor union. Its members, who are working men and women, adopted a constitution which provides that "all jurisdictional controversies which may arise between" unions affiliated with it, shall be submitted to, and determined by, its Executive Council, subject to the right to appeal to the Annual Convention. It issued charters to various international unions, including The American Newspaper Guild, hereinafter referred to as the Guild, and The International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, hereinafter referred to as the Teamsters. The charters of both the Guild and the Teamsters contained the same provision regarding settlement of jurisdictional disputes as is related above. The Teamsters had in turn, chartered a local union, known as Newspaper Drivers and Helpers, Local No. 763, hereinafter called the Drivers. The Guild had chartered a local union known as the Seattle Newspaper Guild, Local No. 82, hereinafter referred to as the Seattle Guild.

Respondent is a Washington corporation, and publishes the Seattle Star, a daily newspaper. Some of respondent's employees, including typographers, janitors, mailing room employees, press room employees, and stereotypers, were members of various labor unions, all affiliated with the American Federation of Labor. Some of such unions had been operating under contracts with the respondent for several years. In respondent's circulation department there were fourteen district managers, whose duties included instruction of carrier boys to properly deliver papers, in procuring new subscribers, and in making collections. In the same department, there were two branch managers, whose duties were similar to those of the district managers, in outlying points. There were also four verifiers, in the same department, who were engaged primarily in investigating complaints of subscribers.

Prior to April, 1937, the district and branch managers transported respondent's papers to the various stations throughout the City of Seattle in their automobiles. The Drivers in April, 1937, "prevailed upon the management to have the" transportation of the papers done by the City Transfer Company, which employed members of the Drivers. Shortly afterward the district and branch managers and the verifiers joined the Seattle Guild. About May 11, 1937, respondent agreed to recognize the Seattle Guild "as the exclusive representative of employees in the circulation department, business office, and classified advertising department," and thereafter bargained collectively with the Seattle Guild.

On May 17, 1937, Dave Beck, an international representative of the Teamsters, advised respondent that the Teamsters had jurisdiction over all circulation department employees. On May 22, 1937, William Green, president of the American Federation of Labor, advised respondent by telegram that the Seattle Guild's jurisdiction was limited to news writers and editorial departments by the charter granted to the Guild. On June 9, 1937, the general manager of respondent wrote to the Seattle Guild "stating that the respondent did not desire to enter into any agreement with the [Seattle] Guild which would conflict with the jurisdiction of any other" union affiliated with the Federation. The Board said that about that time respondent was familiar with reports that the Guild, at its convention early in June, 1937, had voted to affiliate with the Committee for Industrial Organization.

At 5:30 p. m. on July 1, 1937, Shaw, a representative of the Drivers, informed respondent's president, that beginning on the following day, the Drivers would not haul respondent's papers unless all respondent's employees in the circulation de-

partment, were either members of the Drivers or made application for such membership. The president of respondent requested time so that the jurisdictional dispute might be settled. The request was refused.

At 9:30 a. m. on July 2, 1937, Shaw, with the consent of respondent, addressed a meeting of the district and branch managers and verifiers. He "informed them that they must, in order to hold their jobs, join the" Drivers, and that they must reach a decision within fifteen minutes. The Board said that it "was made clear that he was appearing before them at his own request, not at the request of the respondent." Shaw then left the room, and all of the men voted to remain in the Seattle Guild, rather than to join the Drivers, and thereafter so informed respondent.

In the meantime, the papers already printed were not being moved, and the presses were stopped. Respondent asked the twenty Seattle Guild employees if they would guarantee delivery of the papers from the plant to the points throughout the city. The employees declined to make such a guaranty. Thereupon, respondent asked the Drivers the same question. The Drivers made the guaranty and in about twenty minutes produced its men to replace the twenty employees belonging to the Seattle Guild. The latter, upon inquiry as to whether or not they were·discharged, were told that they would be kept on the payroll for at least two weeks.

In the afternoon on July 2, 1937, the Seattle Guild's members met and voted authority to a strike committee to call a strike unless a satisfactory adjustment could be made. The committee then conferred twice with respondent, but no satisfactory adjustment was made. On the same day the Seattle Guild filed a charge with the Board alleging that respondent had engaged in and was engaging in unfair labor practices affecting interstate and foreign commerce. At 10:30 a. m. on July 3, 1937, all respondent's employees who were members of the Seattle Guild went on strike. Publication was suspended until July 9, 1937, when the plant was reopened with police assistance furnished by the mayor of Seattle. The Board said that at "the time of the hearing, the plant had not been shut down again, although the [Seattle] Guild members remained on strike".

The Board issued its complaint on July 13, 1937. It alleged that on July 2, 1937, respondent transferred the twenty employees, who were members of the Seattle Guild "from their regular jobs in the circulation department to temporary positions in other departments because they joined and assisted and refused to give up their membership in the" Seattle Guild; that the "respondent refused and is refusing to reinstate [such] individuals to their regular positions or to assure them of regular employment"; that by such action the respondent discriminated and is discriminating against such individuals in regard to hire and tenure of employment and thereby discouraged and is discouraging membership of its employees in the Seattle Guild. Such acts were alleged to violate § 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3).

Respondent by answer, admitted transfer of the men, denied the unfair labor practices charged, and alleged that the Board had no jurisdiction because nothing was involved but a jurisdictional dispute between unions which was entirely within the jurisdiction of the Federation.

Hearings were held beginning July 27, 1937, and ending on July 30, 1937. On July 28, 1937, the twenty men who had been employed to take the places of the Seattle Guild employees, and the Drivers filed a petition seeking "leave to intervene * * * and to file the attached 'Objections and Answer to the Complaint' * * *". The objections to the Board's jurisdiction were based on three grounds, one of which was that the dispute was within the jurisdiction of the Federation. The answer denied the unfair labor practices charged, admitted the transfer of the employees. As an affirmative defense, it was alleged that the dispute was within the Federation; that the Central Labor Council of Seattle is a voluntary association chartered by the Federation and is composed of delegates from all local unions affiliated with the Federation; that said Central Labor Council had, by resolution, prohibited any local union from calling a strike against an employer without first lodging a complaint with, and obtaining, after a hearing, consent of, the Executive Board of the Central Labor Council; and that the Seattle Guild went on strike in violation of such resolution.

The Board denied the petition for leave to intervene. On December 11, 1937, the Board filed its decision. The evidentiary facts recited above are taken from its findings. As ultimate facts, the Board found: "* * * The 20 men in question were presented with the alternative of transfering their membership from their chosen organization, the [Seattle] Guild, to the [Drivers], or of being removed from their regular jobs with no guarantee for the future apart from a place on the pay roll guaranteed for but two weeks. They chose to remain in the [Seattle] Guild, and the resultant removals from their jobs constituted an unmistakable blow at the [Seattle] Guild and a clear violation of the Act * * *.

"We find that the respondent has discriminated in regard to hire and tenure of employment against the 20 men in question, and that it has thereby discouraged membership in the [Seattle] Guild and interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

The Board ordered respondent to cease and desist from (1) discouraging membership in the Seattle Guild by discriminating against its employees; (2) interfering with, restraining or coercing its employees in the exercise of the rights guaranteed by § 7 of the Act, 29 U.S.C.A. § 157. The Board further ordered respondent to (1) offer the twenty employees in question "immediate and full reinstatement to their former positions without prejudice to their seniority and other rights and privileges"; (2) "Make whole [such employees] for any loss of pay they have suffered by reason of the respondent's discriminatory acts"; and (3) post notices that it would cease and desist the practices mentioned above.

On January 17, 1938, the Board petitioned us for enforcement of the order. A few days before the hearing of the petition, the Drivers and the workmen who were employed to fill the positions of the twenty men in question, filed a petition herein, alleging the two grounds mentioned in their answer, which was attached to their petition to the Board for leave to intervene, and in addition alleged that if the Board's order is enforced, the workmen named in the petition "will be deprived of their jobs without due process of law in violation of their rights under the Fifth Amendment [U.S.C.A.Const. Amend. 5]

* * *". They prayed "that their petition for leave to intervene be granted and that they be allowed to present oral arguments at the hearing". At the hearing we took under advisement the question as to whether the petition should be granted, but permitted counsel for the petitioners to present his argument.

Respondent contends that the Board erred in refusing to grant the petition to intervene. The Board contends that "respondent has no standing to raise the matter." Section 10(b) of the act, 29 U.S. C.A. § 160(b), provides in part: "In the discretion of the member, agent or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony."

Is the word "intervene" there used in the sense that the right to intervene shall be determined by rules regarding intervention in court proceedings? If it does it is clear that intervention was properly disallowed, because the proposed interveners sought intervention for the purpose of attacking the jurisdiction of the Board. State of Washington v. United States, 9 Cir., 87 F.2d 421, 430, 435, and cases cited in note 22. However, a strong argument could be made that the word "intervene" was not used in such a legal sense, because the whole procedure before the Board differs from that in a lawsuit. Section 10(b) specifically provides that "the rules of evidence prevailing in courts of law or equity shall not be controlling". Here, none of the parties have discussed any of the pertinent legislative history, and in the absence of such history, we think that the meaning of the word "intervene" should not at this time be fixed. We may here dispose of respondent's contention on the merits.

Respondent argues that the proposed interveners had such an interest in the controversy that to deny their petition was an abuse of discretion. We think the Board rightly held that the question before it was whether respondent had engaged in an unfair labor practice as charged. Whether respondent had so engaged was a question which, by the provisions of the act, was of no concern, we think, to the proposed interveners. It was not they who were discriminated against. In fact, had the proposed interveners been admitted in the proceeding, the evidence which they proposed to submit, would, according to

the admission of their counsel on oral argument, amplify the evidence to show that the controversy was a jurisdictional dispute between two unions. That fact, we think, is immaterial here.

■ Respondent also contends that the "Board erred in refusing to take jurisdiction of the other one-half of the controversy". But we think the proposed interveners were not a part of the controversy. As stated, the question for the Board to determine, was whether respondent had engaged in an unfair labor practice affecting commerce, by discriminating against the twenty men in question. Here, while the alleged unfair labor practice may have been caused by a jurisdictional dispute between unions, the act prohibits unfair labor practices without regard to the factors causing them.

■ Respondent also contends that there was no discharge of the men in question, but the complaint alleges no discharge. It alleged discrimination within § 8(3) of the act, 29 U.S.C.A. § 158(3), which provides that it shall be an unfair labor practice for an employer "By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization". Respondent makes no contention that the transfer of the men in question was not such a discrimination.

■ The respondent further contends that it was necessary to make the transfer, and thus engage in the unfair labor practice, because its business would otherwise be disrupted, and therefore, under all the facts, the transfer was excusable. We think, however, the act is controlling. The act prohibits unfair labor practices in all cases. It permits no immunity because the employer may think that the exigencies of the moment require infraction of the statute. In fact, nothing in the statute permits or justifies its violation by the employer.

■ It is further contended by respondent that the strike was unwarranted and unjustifiable, and that the men in question should not be permitted to secure reinstatement because they attempted "to economically destroy" respondent by the strike. We think there is no merit in this argument. The men went on strike because of the unfair labor practice committed by respondent, prior to the walkout. Section 13 of the act, 29 U.S.C.A. § 163, provides: "Nothing in this Act [chapter] shall be construed so as to interfere with or impede or diminish in any way the right to strike." To sustain respondent's contention would impede the right to strike. Employees may go on strike because of an unfair labor practice, and may in addition institute proceedings before the Board.

■ Finally, respondent contends that compliance with the Board's order "from a practical standpoint, means exactly the same situation which the respondent faced on the morning of July 2" and that it "would mean a closed plant" because the Drivers will refuse to haul the papers. Assuming that respondent's prophecy is correct, it is no obstacle to the enforcement of the order. By the act, Congress has said that certain unfair labor practices cause strikes which have the effect of burdening interstate and foreign commerce. It has acted to protect such commerce, by prohibiting certain practices which it has termed "unfair". It did not choose to protect such commerce from all impediments or strikes, but simply attempted to prevent certain acts which would affect such commerce because such acts lead to strikes. No attempt was made to prevent strikes as such, but only certain acts which might cause strikes. The act of the Drivers in refusing to work, is not one of the acts prohibited. Respondent's contention in the last analysis, is that it is subjected to great hardship, which should also have been dealt with by Congress. We think that such an argument should be submitted to Congress but not to us. Whether or not Congress may deem it wise to enlarge its policy, will be pertinent here, but only when it has done so. Cf. National Labor Board v. Jones & Laughlin Corporation, 301 U.S. 1, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352.

■■ The proposed interveners urge that the dispute, as to which union has jurisdiction, by virtue of the charter provisions should be determined by the Federation, and rely on cases where the courts have declined to enter into a dispute which could be settled by the union. The charter provisions cannot be permitted to control an exercise by Congress of the power to regulate commerce, and the contractual relationships arising under the charter provisions are subject to the exercise of that power. National Labor Relations Board v. Mackay Radio & Telagraph Co., May

16, 1938, 58 S.Ct. 904, 82 L.Ed. ——; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, 145, 146, certiorari denied May 23, 1938, 58 S.Ct. 1045, 82 L.Ed. ——. The proposed interveners further assert that they will be deprived of their positions without due process of law. We think they misconceive the effect of the order. The order does not discharge the proposed interveners, it compels respondent to exercise a right of discharge it admittedly has. National Labor Relations Board v. Mackay Radio & Telegraph Co., supra; National Labor Board v. Jones & Laughlin Corporation, supra, page 45, 57 S.Ct. page 628. See also: National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 871.

The petition for enforcement of the order is granted.

STEPHENS, Circuit Judge (concurring).

I concur with my associates in granting the order of enforcement and in the opinion supporting it. At the same time I think it right and just for this court to say that, so far as the record goes, Respondent has endeavored to live up to the letter and spirit of the Wagner Act, 29 U.S.C.A. § 151 et seq., and that its violation was solely because of the very serious dilemma into which Respondent was precipitated by the demand that forthwith its District Managers or Verifiers should be Teamster Union men instead of Guild members.