## NATIONAL LABOR RELATIONS BOARD v. KENTUCKY FIRE BRICK CO.

### No. 7866.

Circuit Court of Appeals, Sixth Circuit.

June 29, 1938.

Rehearing Denied Oct. 12, 1938.

90

Philip G. Phillips, of Cincinnati, Ohio (Charles Fahy, Robert B. Watts, Laurence A. Knapp, and Mortimer B. Wolf, all of Washington, D. C., on the brief), for petitioner.

William Beye, of Pittsburgh, Pa., and B. L. Rawlins, Jr., of Chicago, Ill. (William Beye, of Pittsburgh, Pa., B. L. Rawlins, Jr., of Chicago, Ill., Charles G. Middleton, and Crawford, Middleton, Milner & Seelbach, all of Louisville, Ky., and Knapp, Allen & Cushing, of Chicago, Ill., on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

This case is before the court on the petition of the National Labor Relations Board for enforcement of its order issued under Sec. 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C. Sec. 151 et seq., 29 U.S.C.A. § 151 et seq., and section 160(c).

The respondent, The Kentucky Fire Brick Company, a Kentucky corporation, having its principal place of business at Haldeman, Kentucky, by cross-petition seeks to have the order reviewed and paragraphs 1, 2, 3 and 4, (a), (b), (c) and (d) set aside. These parts of the order are printed.[1]

---

[1] "1. Cease and desist from discouraging membership in Local Union No. 510 of the United Brick and Clay Workers of America, or any other labor organization of its employees, by discharging, threatening to discharge, or refusing to reinstate any of its employees for joining or assisting Local Union No. 510 of the United Brick and Clay Workers of America, or any other labor organization of its employees;

"2. Cease and desist from in any manner discriminating against any of its employees in regard to hire or tenure of employment for joining or assisting Local Union No. 510 of the United Brick and Clay Workers of America, or any other labor organization of its employees; and

"3. Cease and desist from in any manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act.

"4. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Offer to Roscoe Adkins, J. R. Bailey, Hazel Christian, Cordie Davis, Ralph Evans, Roland Eldridge, Dave Glover, Squire Hall, W. C. Hogge, Ivan Hogge, William Lewis, J. E. Messer, Estill Oney, Everett Oney, Frank Pettit, Ersell Parker, D. W. Rakes, C. C. Sparks, Andy Sturgell, Roy Sturgell,

A primary question is whether the business of respondent in its relation to interstate commerce is subject to the Act.

Respondent operates two clay mines and two fire brick plants at Haldeman, employing around 300 men. It transports its clay from the mines to the plants and there manufactures it into fire brick. All materials used in the manufacturing processes are obtained within the State of Kentucky. During the eight months' period ending March 1, 1936, respondent made 148 shipments of machinery to these plants from seven states other than Kentucky at a total cost of $7,870.86. During the years 1934 and 1935 the plants produced 60,000 bricks a day. These fire bricks are used as linings in open hearth furnaces in steel plants.

Respondent is a subsidiary of the Illinois Steel Corporation, which in turn is a subsidiary of the United States Steel Corporation and all of respondent's bricks are sold to other subsidiaries of United States Steel Corporation located in at least ten different states other than Kentucky. The shipments from the plants are handled by the Chesapeake & Ohio Railway, an interstate carrier.

Upon a consideration of these undisputed facts we think that the power of the Board to issue the order in controversy is beyond question. See Santa Cruz Packing Co. v. National Labor Relations Board, 58 S.Ct. 656, 82 L.Ed. 954, decided by the Supreme Court, March 28, 1938; National Labor Rel. Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; also Clover Fork Coal Co. v. National Labor Rel. Board, 6 Cir., 97 F.2d 331, decided by this court June 8, 1938.

In May, 1934, respondent organized among its employees at the Haldeman plants the "Haldeman Employees Representation Plan" herein called "the Plan." The evidence indicates that this organization was to a large extent dominated by respondent. Many of the members soon becoming dissatisfied with the Plan, withdrew from it and organized Local Chapter No. 510 of the "United Brick and Clay Workers," herein called "the Union," which was affiliated with the American Federation of Labor.

In December, 1934, representatives of the Union undertook to negotiate a contract with respondent's president for the regulation of wages, hours and working conditions but he refused to discuss the matter. The spokesman of the committee testified,—that "he" (the president) "said he understood that it was the policy of the Union for such committee to come in to see him possibly a dozen times concerning an agreement or contract, and if that was true, we could go out of the door and come back to the office the required number of times; that he had given us his final answer; that his final answer was that they were not entering into any contract or agreement * * *" and "that if any of us had any personal matter to take up, he referred us to the proper representatives of the Representation Plan. * * *"

A strike ensued and the Union filed a complaint with the old National Labor Relations Board organized to administer the provisions of Sec. 7(a) of the National Industrial Recovery Act, 15 U.S.C.A. § 707(a). The strike was settled after National Guardsmen had been called to the scene but when the plants were reopened respondent refused to reinstate one of the

James Sturgell, Marvin Sturgell, C. S. Stinson, George Sparkman, C. H. Stamper, William Sammon, Cleo Stewart, W. F. Thomas, Carl White, and Silas Wilson, and each of them, immediate and full reinstatement, respectively, to their former positions, without prejudice to their seniority or other rights and privileges;

"(b) Make whole the persons named in paragraph 4(a) above, and each of them, for any losses of pay they have suffered by reason of their discharge, by payment to them, respectively, of a sum of money equal to that which each would normally have earned as wages during the periods from October 31, 1935, to the receipt of the Intermediate Report by the respondent and from the date of this decision to the time of such offer of reinstatement, less the amounts, if any, which each earned during such periods;

"(c) Post immediately notices to its employees in conspicuous places throughout its place of business, stating (1) that the respondent will cease and desist in the manner aforesaid, and (2) that such notices will remain posted for a period of at least thirty (30) consecutive days from the date of posting;

"(d) Notify the Regional Director for the Ninth Region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply herewith."

members of the Union. As a result a complaint was filed with the old Board which was never acted upon because of the invalidation of the National Industrial Recovery Act in the case of Schechter Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

In June, 1935, a committee of the Union again presented a contract to respondent's president, vice-president and superintendent and secretary-treasurer, but these officers refused to consider it. The testimony is that the president said in substance,—"It seems as though you fellows are going to run this business." Further, that "I will shut the damned thing down, and let it sit there, and possibly the rust will eat it up." A strike followed immediately and the plants were closed for about four months during which time shipments to and from the plants ceased.

During this period the Union continued its effort through intermediaries to negotiate with respondent but without avail. The president of respondent absented himself and other officials left in control declared themselves without authority to act. The strike was attended with violence such as shooting, dynamiting and personal difficulties but it does not clearly appear that loss of life or substantial property damage resulted therefrom. The ill feeling was intensified by the fact that members of the Plan appeared to be in sympathy with respondent. In October respondent announced that it intended to re-open its plants and would reinstate all its employees who had not been guilty of violence or of interfering in an illegal manner in its operations and business. It distributed cards to those whom it intended to reinstate and directed them to report for work. It reopened its plants on October 17, but the union members, including those who had received cards, did not return.

Shortly thereafter the Union permitted such of its members as had received cards to return and filed charges against respondent with the Board, to the effect that respondent had refused to reinstate a large number of its employees because they had joined Local Union No. 510, and had engaged in concerted activities with other employees for the purpose of collective bargaining and that it had therefore engaged, and was engaging, in unfair labor practices within the meaning of Sec. 8, subdivisions (1) and (3) of the Act, 29 U.S.C.A. § 158(1, 3).

The Board found that the activities of the respondent in connection with the operation of its plants tended to lead to labor disputes which burdened and obstructed the free flow of commerce. It found as a matter of law that the strike of June 18, 1935, was a labor dispute within the meaning of Sec. 2, subdivision (9) of the Act, 29 U.S.C.A. § 152(9). It dismissed the complaint as to all except thirty employees but ordered them reinstated in their former positions, [Par. 4(a) of the order], finding they had been denied reinstatement because they had joined and assisted the Union. These men were all active members of Local No. 510, and it is significant that the list included its vice-president, recording secretary, financial secretary and treasurer. It also included seven other men who were members of various committees appointed by the Union to negotiate with respondent. It included no members of the Plan.

■ We think that the attitude of respondent toward its Union employees both before, during and after the strike of June 18, 1935, carries a substantial inference that these 30 men were refused reinstatement because of their union activities. This inference is sufficient to support the order unless it is destroyed and refuted by other evidence now to be considered. See Sec. 10(e) of the Act, 29 U.S.C.A. § 160(e); National Labor Rel. Board v. Pennsylvania Greyhound Lines, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, decided by the Supreme Court February 28, 1938; and Washington Coach Co. v. Labor Board, 301 U.S. 142, 147, 57 S.Ct. 648, 650, 81 L.Ed. 965.

Respondent's contention is, that it refused to re-employ these thirty old employees because of an honest belief reasonably entertained that they had been guilty of violence and unlawful acts against its property and against the persons and property of its employees. In support of its refusal it introduced the evidence of an investigation, consuming a week or ten days, made by its attorney at its instance, to determine who had been guilty of violence and unlawful conduct. He interviewed a number of persons, employees and non-employees, and took about thirty-five affidavits (not introduced in evidence) which he transmitted to respondent, along with two letters in one of which he submitted the names of 33 men and said that they "are shown in the statements to have banded and confederated

together and made threatening remarks against the destruction of human life and property sufficient to have committed a felony." In the second letter he added the names of three other men "who have made most damaging threats against the company and its property."

These 36 men were all members of the Union and 30 of their number were those ordered reinstated by the Board. The attorney neither interviewed these men nor gave them notice that their activities were being investigated. Seventeen of them testified that they had committed no acts of violence nor engaged in the destruction of property or other unlawful conduct. Fifteen of them had service records with respondent ranging from four to twenty-six years. Respondent's excuse for withholding the affidavits was that the revelation of their contents would probably have resulted in further violence and disorder but this excuse, of course, had no probative force upon the matters in controversy before the Board. In short, there was no evidence that the men whom the Board ordered reinstated were guilty of violence or unlawful conduct.

Respondent apparently concedes this and says that it had no motive for discriminating against these men on account of their union activities but acted in good faith upon the advice of counsel. The principal, though not the only, weakness of this contention is that only respondent and its counsel knew the contents of the undisclosed affidavits upon which the action was based. We think that, upon the whole, the evidence does not refute the substantial inference that respondent refused to re-employ these men because they had joined the Union and had become active members thereof. See Associated Press v. Labor Board, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953.

One other matter calls for consideration.

The Trial Examiner filed his report with the Board on July 29, 1936. He therein determined that respondent's unfair labor practices did not affect commerce within the meaning of subdivisions (6) and (7) of Sec. 2 of the Act, 29 U.S. C.A. § 152(6, 7). His conclusion was no doubt based upon the decision in Carter v. Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. No further action was taken until April 29, 1937, when the attorney for the Board, acting on behalf of Local No. 510, moved for a reopening of the controversy. The ground for the motion was that the finding of the Trial Examiner was in conflict with the decisions of the Supreme Court of April 12, 1937, in the Labor Board Cases.

The respondent resisted the motion upon the ground that no exceptions had been taken to the report within ten days as provided for in Sec. 34, Art. 2 of the Rules and Regulations of the Board, and that the case should be considered closed in accordance with Sec. 36 of the same Article. But Sec. 36 contains the following independent provision:

"The Board may, upon motion made within a reasonable period, and upon proper cause shown, reopen the record for further proceedings in accordance with this section."

Respondent contends that this rule should not be applied because the motion was not made within a "reasonable period" and further because the Examiner's adverse report on the question of jurisdiction was not affected by the decisions in the Labor Board Cases. We think that in view of those decisions the Board did not abuse its discretion by granting the motion. We do not think that respondent was affected thereby in any of its substantial rights since the Board declined to direct the payment of wages to the reinstated men for the interval between the report and its decision.

Respondent's petition to set aside the order is denied and a decree will be entered for its enforcement.