## NATIONAL LABOR RELATIONS BOARD v. CROWE COAL CO.

### No. 435, Original.

Circuit Court of Appeals, Eighth Circuit.
June 26, 1939.

Samuel Edes, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, Mortimer B. Wolf, Bertram Edises, and John H. Dorsey, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Frank H. Terrell, of Kansas City, Mo. (H. M. Langworthy, Byron Spencer, Carl D. Matz, and Langworthy, Spencer, Terrell & Matz, all of Kansas City, Mo., on the brief), for respondent.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This case comes before the court upon petition by the National Labor Relations Board for the enforcement of an order issued by it pursuant to Section 10 (c) of the National Labor Relations Act, July 5, 1935, 29 U.S.C.A. § 151 et seq., against respondent, Crowe Coal Company, a Missouri corporation, which operates a coal mine in Henry County, Missouri. (Case No. C–564, decided Nov. 23, 1938.)

The case was begun by the filing with the Board of a charge by United Mine Workers of America, District No. 14, a labor organization referred to as the United. Thereafter United filed its amended charge in which it was alleged that respondent had engaged in and was engaging in certain described unfair labor practices affecting commerce as defined in the Act. The Board by its Regional Director at Kansas City, Missouri, issued a complaint and notice of hearing, which were served upon respondent. It was charged in the complaint that respondent discharged and refused to reinstate Kaples Forsythe, A. W. Sivils, Charles Kern and Carey Scott because they had joined and assisted the United and engaged in concerted activities with other employees of respondent for the purpose of collective bargaining and other mutual aid and protection; that by the aforesaid discharges and other acts respondent interfered with, restrained and coerced its employees in the exercise of the rights guaranteed to them by Section 7 of the Act; and that by the foregoing acts respondent had engaged in and was engaging in unfair labor practices affecting commerce within the meaning of Section 8 (1) and (3) and Section 2 (6) and (7) of the Act. Respondent filed an answer in which it denied all the material allegations of the complaint.

A hearing was held at Kansas City, Missouri, before a Trial Examiner designated by the Board. At the hearing, counsel for the Board and for respondent entered into an "Agreed Statement of Facts", setting forth the facts as to the nature of respondent's business and containing the following paragraph dealing with the unfair labor practice charges:

"It is hereby stipulated * * *

"4. That the evidence which would be offered by the National Labor Relations Board at the hearing in the above-entitled matter as the reason for the discharge of the above-named employees, and each of them, would be sufficient to justify a finding by the National Labor Relations Board that the above-named men were discharged from the employ of the respondent because of their membership in the United Mine Workers of America, District No. 14."

No testimony of witnesses as to the discriminatory character of the discharges was introduced. Thereafter, the Trial Examiner filed with the Board his Intermediate Report in which he found that respondent had engaged in unfair labor practices as alleged in the complaint. Exceptions to the Intermediate Report were filed with the Board by respondent.

Thereafter the Board, being of the opinion that "the record was inadequate for a determination of the issues", issued an order, pursuant to Article II, Section 36, of the Board's Rules and Regulations, reopening the hearing for the purpose of introducing further evidence. Thereafter, due notice of the holding of a further hearing "on the complaint heretofore issued in the * * * matter" having been given, a second hearing was held before the Trial Examiner designated by the Board. At this hearing, the Board called witnesses and introduced evidence upon the issue whether or not the respondent had been guilty of the unfair labor practices alleged in the complaint.

At the conclusion of the second hearing, counsel for the Board requested that the record be kept open for the inclusion of "material that will pertain to the bituminous coal industry generally", and counsel for respondent also indicated that if respondent desired, the same opportunity should be given to it "to offer similar documentary proof." Counsel for the Board subsequently offered in evidence Bulletin No. 2 purporting to be a publication of the Division of Economic Research of the National Labor Relations Board, entitled "The Effect of Labor Relations in the Bituminous Coal Industry Upon Interstate Commerce", containing general economic and historical data and statistical tables relating to the subject of the title. The respondent filed objections to the introduction of this material in evidence on the grounds that the data was unverified hearsay "of no evidentiary value" and immaterial under the issues. The Board in its decision overruled the objections and ordered that the data be made part of the record. No objections to such action are argued here.[1]

The respondent argued the case orally before the Board and filed a brief in support of its conclusions and on consideration of the entire record, the Board rendered its decision setting forth its findings of fact, conclusions of law, and the order now before us.

The findings of fact made by the Board were based upon the agreed statement of facts submitted before the examiner at the first hearing and the testimony taken before the examiner at the second hearing. The facts concerning the business of the respondent were found separately from those relating to the discharge of the workmen. In Section I it was found as to the nature of respondent's operations that respondent, "a Missouri corporation, operates a strip mine in Clinton, Missouri, and maintains a sales office in Kansas City, Missouri. During the year 1936, the respondent mined

[1] The propriety of introducing in evidence economic data of the character of Board's Exhibit 11, obtained from governmental or other authoritative sources, is well settled. See, for example, Virginian Railway Company v. System Federation No. 40, 300 U.S. 515, footnotes 4 and 5, pages 545, 546, 57 S.Ct. 592, 599, 81 L.Ed. 789, in which the Supreme Court referred to the bulletin entitled "Governmental protection of Labor's Right to Organize," which is Bulletin No. 1 in a series prepared by the Board's Division of Economic Research. The exhibit now under consideration is Bulletin No. 2 of the same series. And see National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, footnote 8, page 43, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, footnote 2, page 267, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

and sold 267,495.5 tons of coal to various consumers. Of this amount, jobbers who accepted delivery at the mine, sent 34,004.74 tons of coal out of the State f. o. b. respondent's mine. In addition, the respondent sold 32,231.33 tons of coal to the Kansas City Power & Light Company and 46,590 tons to the St. Louis-San Francisco Railway Company for road and engine service and for use in its stationary plants. The Kansas City Terminal Railway Company purchased 17,888.58 tons of coal which were used at its power house in Kansas City, Missouri."

In respect to the unfair labor practices, the Board found, Section III, "that respondent discharged Kaples Forsythe, Albert Sivils, Charles Kerns, and Carey Scott because of their membership and activity in the United; that respondent discriminated against its employees in regard to hire and tenure of employment, thereby discouraging membership in a labor organization; and that by the foregoing acts respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

Upon the foregoing findings of fact, the Board concluded the respondent had engaged in and was engaging in unfair labor practices in violation of Section 8, subdivisions (1) and (3) of the Act, and that said unfair labor practices affected commerce within the meaning of Section 2, subdivisions (6) and (7), of the Act. Thereupon the Board ordered respondent to cease and desist from discouraging membership in the United, or any other labor organization of its employees, by discriminating in regard to hire or tenure of employment or any term or condition of employment; and from in any manner interfering with, restraining, or coercing its employees in the exercise of the rights as guaranteed in Section 7 of the Act.

As affirmative action which the Board found would effectuate the policies of the Act, the Board directed respondent to reinstate the four men to their former positions, to make them whole for part of their back pay and to post appropriate notices.

The Board's findings with respect to the nature of respondent's operations are based on the agreed statement of facts entered into between counsel for respondent and counsel for the Board and are not in dispute. It appears that respondent is a corporation organized under the laws of Missouri and is engaged in the operation of a strip coal mine located near Clinton, Missouri. Its only offices and places of business are its principal office and place of business in Kansas City, Missouri, and its office at Clinton, Missouri. The business done during the year 1936 was tabulated in the agreed statement and it was agreed that the sales, manner of billing and tonnage shown by the tabulation for the year 1936 was a representative year of respondent's business and is representative of all the periods of time here involved. During that year, respondent produced 267,494.50 tons of coal. Of its total production, 34,004.74 tons, or 12.7 per cent, was sold loaded in the cars at the mine to jobbers and billed at their direction to points outside the State of Missouri, and 64,478.58 tons, or 24.1 per cent, was sold to the St. Louis-San Francisco Railway and the Kansas City Terminal Railway Company.[2] Of the coal sold to the railways, 22,638.58 tons, or approximately 36 per cent, was used in the generation of power and production of heat in stationary plants within the State of Missouri, and 41,480 tons or approximately 64 per cent, was used directly in engine service as locomotive fuel. Thus, during the year 1936, a total of 98,583.32 tons, or 36.8 per cent of respondent's total production of coal, entered into the channels of interstate trade or was used either in the servicing of instrumentalities of interstate commerce or in the maintenance of facilities essential to the functioning of such instrumentalities. In addition, the Kansas City Power & Light Company purchased 32,090.10 tons, or 11.9 per cent of the coal produced by respondent. 5.4 per cent of the electrical energy generated by this company is transmitted to points outside the State of Missouri. The amount of coal sold by respondent to the railway carriers and the power company constituted only a fraction of a per cent of the total coal used in the operations of the utilities and of the total coal produced in respondent's competitive trade territory. The amount that went into interstate commerce was an even smaller fraction of totals in such commerce.

The main question for determination is whether the National Labor Relations Act of July 5, 1935, is applicable. The first

[2] The two named railways are interstate carriers. Fifty-first Annual Report of the Interstate Commerce Commission on the Statistics of Railways in the United States for the Year Ended December 31, 1937.

section of the Act recites, among other things, that the refusal by employers to accept the procedure of collective bargaining leads to strikes and other forms of industrial strife and unrest, and that the inequality of bargaining power between employees who do not possess full freedom of association, and employers who are organized in corporate form of ownership, substantially burdens and affects the flow of commerce and tends to aggravate recurrent business depressions by depressing wage rates and the purchasing power of wage earners in industry; that experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from impairment or interruption and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest. There can be and is no dispute upon the record presented but that the respondent corporation discharged the four named employees because of their union activity and membership and denied them the rights which Congress intended to protect and which it accorded by Section 7 of the Act to those who are within the scope of the protection.

The respondent contends that the workmen in its employ were not within the protection of the Act; that the respondent's business, in which they were employed, is not interstate commerce, and that its activities are of such intrastate and local character that they do not directly affect interstate commerce and that interference with its business through strikes or strife with, or industrial unrest of its industrial employees would not constitute a burdening or obstructing of commerce or the free flow of commerce. The Board found:

"The activities of the respondent set forth in Section III above, occurring in connection with its operations described in Section I above, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States, and tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce."

Whether the interference with or stoppage of the operations of a particular corporation through industrial strife will or will not interfere with or obstruct the flow of interstate commerce, must depend upon the relation of the corporation's operations to the commerce. It is recognized that bituminous coal is of basic importance to the economic life of the country and the main energy supply of all its industries, and that only a small percentage of it (3.3) is used locally at the points of production. It is produced in some of the states, but is transported in interstate commerce to every state. Such transportation constituted 31.8 per cent of all freight carried by rail in 1936. Having such vast coal supplies within the country made accessible in commerce to every part is a prime factor in the economic advantage the country has over all others. No comparable condition is to be found elsewhere.

The parties in this case have not sought to belittle or minimize the contribution of the respondent to the general commerce in bituminous coal. Its output of 267,494 tons a year reflects corporate enterprise of substantial magnitude and the combination of its production and selling activities which enables it to carry on continuously in the competition of its trade territory, forbids classing it as a negligible unit. The multiplication of such units makes up a large part of the whole coal industry. Likewise, the 34,000 tons of coal which it annually loads on wheels moving immediately and directly in interstate commerce to points outside the state amount to a substantial quantity contribution to that commerce. It is argued in respondent's brief that it has "no knowledge * * * of the use to which this coal will be put or the place to which it will be transported", but no such want of knowledge was stipulated or found by the Board. It is stated in the Bulletin of the economic division in evidence that "typically there is no provision for storage of coal at the mine" and that "production is customarily not undertaken until orders are received and a supply of cars assured." A list of respondent's customers in Nebraska, Iowa, and Kansas, at whose orders the interstate shipments were made, is included in the agreed statement of facts and whatever the true facts may be, the record presents nothing to justify this court to hold that this company's agents at Kansas City or Clinton had no knowledge where their trade territory was. The respondent's activities, like those of many other corporations engaged in selling, mining and loading coal for distribution in commerce, both intrastate and interstate, have a close relation to trade, traffic and commerce among the several states, and a cessation of its shipments through industrial strife would directly and to some extent affect interstate commerce.

The respondent cites Carter v. Carter Coal Company, 298 U.S. 238, 56 S.Ct. 855, 869, 80 L.Ed. 1160, as compelling a contrary conclusion. In that case, the Supreme Court considered the constitutionality of the Bituminous Coal Conservation Act of 1935. The several parts of the Act were found to be interdependent and it was found to be unconstitutional in its entirety. In one part the Act assumed to provide regulations governing labor relations in the bituminous coal industry. The court considered the bituminous coal industry as made up of "distinct and separate activities", the "production", the distribution after the product has "come to rest", and the other activities, including the movement in commerce. It emphasized the decision rendered in the case of Schechter (A. L. A. Schechter Poultry Corp. v. U. S., 295 U.S. 495, 55 S. Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947) that the power of Congress to regulate commerce does not extend to commodities which have moved in interstate commerce and have come to rest at destination, and said: "The government's contentions in defense of the labor provisions are really disposed of adversely by our decision in the Schechter Case, supra. The only perceptible difference between that case and this is that in the Schechter Case the federal power was asserted with respect to commodities which had come to rest after their interstate transportation; while here, the case deals with commodities at rest before interstate commerce has begun. That difference is without significance. The federal regulatory power ceases when interstate commercial intercourse ends; and, correlatively, the power does not attach until interstate commercial intercourse begins. There is no basis in law or reason for applying different rules to the two situations." The decision in the Carter case has not been overruled in express terms and it is certain the court has not departed from its determination that many industrial activities, including the "production" of coal, are, taken by themselves, merely local, but it is manifest that in the later opinions of the court the concept of an extensive industry thus delineated in three "distinct and separate" activities has not controlled decision. It is evident that the concert of the activities in the various industries and the effect of the concert of the activities upon commerce, rather than the delimitation of the parts of the industries, has come to have more weight in the conclusions arrived at by the court.

Thus in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, loc. cit. 40, 57 S.Ct. 615, loc. cit. 626, 81 L.Ed. 893, 108 A.L.R. 1352, the court concluded its discussion of the application of the Act now in question to a manufacturing corporation: "It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved. In the Schechter Case, supra, we found that the effect there was so remote as to be beyond the federal power. To find 'immediacy or directness' there was to find it 'almost everywhere,' a result inconsistent with the maintenance of our federal system. In the Carter Case, supra, the Court was of the opinion that the provisions of the statute relating to production were invalid upon several grounds,— that there was improper delegation of legislative power, and that the requirements not only went beyond any sustainable measure of protection of interstate commerce but were also inconsistent with due process. These cases are not controlling here."

These excerpts from Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 59 S.Ct. 206, 212, 83 L.Ed. 126, are illustrative: "The petitioning companies constitute an integrated system." " * * * there is undisputed and impressive evidence of the dependence of interstate and foreign commerce upon the continuity of the service of the petitioning companies." "It cannot be doubted that these activities, while conducted within the State, are matters of federal concern." "But it cannot be maintained that the exertion of federal power must await the disruption of that [interstate] commerce. Congress was entitled to provide reasonable preventive measures and that was the object of the National Labor Relations Act."

Excerpted from Santa Cruz Fruit Packing Co. v. Labor Board, 303 U.S. 453, 58 S.Ct. 656, 659, 82 L.Ed. 954: "The power of Congress extends not only to the making of rules governing sales of petitioner's products in interstate commerce * * * but also to the protection of that interstate commerce from burdens, obstructions, and interruptions, whatever may be their source. * * * The close and intimate effect which brings the subject within the reach of federal power may be due to activities in relation to productive industry, although that industry when separately viewed is local. It is upon this well-estab-

lished principle that the constitutional validity of the National Labor Relations Act has been sustained."

The decision in the Carter case does not compel the conclusion that the local character of respondent's mining operation alone precludes federal regulation of its labor relations. Its activities as a whole directly affect interstate commerce.

The more serious question presented for the respondent concerns the extent to which the commerce is so affected. It is urged that the federal power does not extend to industrial activities of such small consequence to commerce as are those of respondent. The arguments are rested mainly on the computations of percentages which demonstrate that when comparison is made between the volume of respondent's coal output and the volume of national production of bituminous coal or the volume of such coal carried in interstate commerce or the total volume used by its carrier and power utility customers, very small fractions are produced. And so it is contended that the respondent's operations are too small to substantially affect commerce. The illustration, among others, is used "in the event a small mine produced a ton of coal per year and sold it to a utility consuming 1,000,000 tons per year, the activities of this mine under the Board's argument would directly affect interstate commerce, etc.", and the ultimates to which the federal power might finally be stretched are imagined and pictured to the mind's eye. The dual form of government is said to be threatened if too small coal corporations are held to be subject to the federal enactment.

The answer is that it is the respondent's business, shown in the evidence, which is to be passed on and not the definition of an absolute to fit all cases. That there are many hundreds of corporations engaged like respondent in the bituminous coal industry may be assumed, and there may be some that are too small to affect commerce or that have nothing to do with interstate shipments or the instrumentalities of such commerce—who merely mine the coal and deliver it to consumers in the state. It may be assumed that there is no one mine, or even group of mines, whose shutting down would stop the commerce in coal. But whether the corporation is or is not within the Act must be determined by the nature and extent of its activities as shown by evidence. As was said in Santa Cruz Fruit Packing Co. v. Labor Board, 303 U.S. 453, loc. cit. 467, 58 S.Ct. 656, loc. cit. 660, 82 L.Ed. 954:

"There is thus no point in the instant case in a demand for the drawing of a mathematical line. And what is reasonably clear in a particular application is not to be overborne by the simple and familiar dialectic of suggesting doubtful and extreme cases. The critical words of the provision of the National Labor Relations Act in dealing with the described labor practices are 'affecting commerce,' as defined. Section 2 (7), 29 U.S.C.A. § 152(7). It is plain that the provision cannot be applied by a mere reference to percentages, and the fact that petitioner's sales in interstate and foreign commerce amounted to 37 per cent., and not to more than 50 per cent., of its production cannot be deemed controlling. The question that must be faced under the Act upon particular facts is whether the unfair labor practices involved have such a close and substantial relation to the freedom of interstate commerce from injurious restraint that these practices may constitutionally be made the subject of federal cognizance through provisions looking to the peaceable adjustment of labor disputes.

"The question of degree is constantly met in other relations."

Here the court is asked to hold that cessation of respondent's operations through labor strife would not substantially obstruct commerce. Although the corporation maintains two offices and sells, produces and loads on railroad cars 267,494.50 tons of coal a year, of which a percentage is used as locomotive fuel by interstate carriers and 12.7 per cent is distributed in its trade territory in other states, it must be conceded that such operations are not comparable in extent to the industrial activities considered by the Supreme Court in any of the cases from which the above excerpts have been taken.

But in the later case of National Labor Relations Board v. Fainblatt, 59 S.Ct. 668, 671, 83 L.Ed. ——, the Court's attention was directed particularly to industrial activities in which "the volume of the commerce * * * was relatively small as compared with that in the cases arising under the National Labor Relations Act which have hitherto engaged our attention". The industry to which the Act was found applicable in that case was carried on by two individuals under firm names. They employed some sixty workers, later increased

to approximately two hundred, in processing materials into various types of women's sports garments. Another partnership supplied the cut-out cloth from without the state and received the finished products within the state, thereupon shipping them in interstate commerce. The court's extended discussion of the questions raised in the case is directly applicable here and compels the conclusion that neither the fact that respondent's business is comparatively small nor the fact that it does not itself control the ultimate destination of the part of its product that goes immediately and continuously into interstate commerce, prevents the application of the federal Act.

It is apparent from the statement of the Fainblatt case in the Supreme Court's opinion that the work done in that respondent's factory would constitute a very small fraction of the vast ready-to-wear garment industry of the country, or of the commerce in such product. It is even probable that computations of percentages produced by comparing the amount of the factory's product taken by some large establishment with the total of such products bought by the establishment would result in small fractions. Such computations are not determinative.

The court may not apply to the respondent the maxim "de minimus non curat lex." The respondent's business is not a petty or trifling matter—either actually or relatively. It is substantial and important from any angle, and so are the labor relations of the respondent and those like it who "contribute in the aggregate a vast volume of interstate commerce" in bituminous coal.

In addition to its presentation of the cases in the Supreme Court the Board has cited the cases from the Second, Third, Fourth, Sixth, Seventh and Ninth Circuits[3] which more or less directly sustain its position. The decision in the Sixth Circuit, in Clover Fork Coal Co. v. National Labor Relations Board, 97 F.2d 331, went upon facts analogous to those here presented and this court is in accord with the conclusions there announced. The respondent has cited from the circuits only National Labor Relations Board v. Idaho-Maryland Mines Co., in the Ninth Circuit, 98 F.2d 129. There the respondent mined gold and silver and delivered the metals within the state where they were mined to the purchaser, the United States government. The holding of the court was that the Act was not applicable to the respondent, but we do not consider the decision in conflict with the others in the same circuit or controlling here.

The Board's conclusion that respondent is subject to the Act is sustained.

*The Back Pay Order.* The Board upon ordering reinstatement with pay of the men whom the petitioner had wrongfully discharged did not order that they be made whole for all of the time they had lost between their discharge and the reinstatement. It declared:

"Although the record reveals that the last conference between the United and the respondent for the purpose of obtaining the reinstatement of the discharged employees took place in November or December 1936, no charges were filed against respondent until May 4, 1937. We shall al-

[3] Black Diamond Steamship Corp., v. National Labor Relations Board, 2 Cir., 94 F.2d 875, certiorari denied 304 U.S. 579, 58 S.Ct. 1044, 82 L.Ed. 1542; National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 3 Cir., 91 F.2d 178; National Labor Relations Board v. J. Freezer & Sons, Inc., 4 Cir., 95 F.2d 840; National Labor Relations Board v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818; Clover Fork Coal Company v. National Labor Relations Board, 6 Cir., 97 F.2d 331; Memphis Furniture Mfg. Co. v. National Labor Relations Board, 6 Cir., 96 F.2d 1018, certiorari denied, 305 U.S. 627, 59 S.Ct. 91, 83 L.Ed. ——; National Labor Relations Board v. Kentucky Fire Brick Company, 6 Cir., 99 F.2d 89; Renown Stove Co. v. National Labor Relations Board, 6 Cir., 90 F.2d 1017; National Labor Relations Board v. Falk Corporation, 7 Cir., 102 F.2d 383, decided March 7, 1939; National Labor Relations Board v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488, certiorari denied 59 S. Ct. 592, 83 L.Ed. ——; National Labor Relations Board v. Carlisle Lumber Company, 9 Cir., 94 F.2d 138, certiorari denied, 304 U.S. 575, 58 S.Ct. 1045, 82 L. Ed. 1539; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 9 Cir., 91 F.2d 458; National Labor Relations Board v. Star Publishing Co., 9 Cir., 97 F.2d 465.

low back pay to the employees for the period during which the Union was seeking to secure the respondent's voluntary compliance with the Act, but we are of the opinion that the employees are not entitled to back pay for the period during which the United failed to file its charges, in the absence of any showing of extenuating circumstances for this delay.[4] We shall, accordingly, order the respondent to make whole each of these men for any loss of pay he may have suffered during the periods from the date of the discharge to the date of the last conference held by the respondent and the United, and from May 4, 1937, until the date of the offer of reinstatement by payment to him of a sum equal to the amount which he normally would have earned as wages during said periods, less his net earnings,[5] during said periods. We shall further order the respondent to cease and desist from its unfair labor practices and to take certain affirmative action which we deem necessary to effectuate the policies of the Act."

The respondent presents that if it is subject to the jurisdiction of the Board of Labor Relations it makes no complaint of that part of the Board's order which is to the effect that the employees were entitled to back pay for the period during which the United was seeking to secure respondent's voluntary compliance with the Act, but were not so entitled during the period the United failed, without extenuating circumstances, to file charges. It is respondent's contention that the only conference between the parties for the purpose of the reinstatement of the employees was in November or December, 1935.

The finding of the Board that there was another conference in November or December, 1936, between the United and respondent for the purpose of obtaining reinstatement of the men was rested on the testimony of the president of the union, who testified that he had a conversation with respondent's president about a year after the conference had between them in November or December, 1935. That in the later conversation the president of the

union repeated his request for the reinstatement of the men and the respondent's president "absolutely refused then."

It is argued for respondent that the testimony indicates that only a casual conversation was had and that the conversation was insufficient to show that the Union had not at that time ceased its efforts to obtain voluntary action by the respondent.

It is not contended that the later request upon respondent was not made or that it was not made in a good faith attempt to accomplish the result sought. There being substantial evidence to support the Board's finding as to when the union's efforts ceased, it should be sustained.

The determination of the relief to be accorded on reinstatement of wrongfully discharged workmen is important in the administration of the Act, and the question presented here is discussed fully in the briefs of the parties. The power and discretion of the Board is considered by the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S. Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352; Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301. U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Mackay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

It is observed that the Act prescribes no time within which charges of unfair labor practices must be lodged. It certainly would not further the objects of the Act to coerce the hasty filing of charges against

---

[4] See Matter of Inland Lime and Stone Company and Quarry Workers International Union of North America, Branch No. 259, 8 N.L.R.B., No. 116.

[5] "By 'net earnings' is meant earnings less expenses, such as for transportation, room and board, incurred by any employee in connection with obtaining work and

working elsewhere than for the respondent which would not have been incurred but for his unlawful discharge and the consequent necessity of his seeking employment elsewhere. See Matter of Crossett Lumber Company and United Brotherhood of Carpenters and Joiners of America, Lumber and Sawmill Workers, Local No. 2590, 8 N.L.R.B., No. 51."

employers by penalizing those employees who, although they may feel aggrieved by some action or inaction of their employer, take reasonable time for discussion, appeal, request and other peaceable means of reconciliation or redress before they resort to charges. It is true that in this case the refusal to reinstate made by respondent in 1935 was in terms of finality. But it was wrongful. The court can not hold as a matter of law that there was no ground for the United to make further effort or that it was required to file charges forthwith on the first refusal on penalty of forfeiting its members' right to claim back pay or reinstatement. Such declaration of the law would inevitably stimulate many burdensome proceedings readily avoidable by taking a reasonable time. Undoubtedly cases may arise where time may be taken to enhance back pay recovery. Such cases must be met when presented. There is no suggestion of delay used for any such wrongful purpose here. The decision of the Board to curtail the back pay, even in the absence of such motive but upon the conditions found, was sufficient caveat. It did not abuse its discretion.

Affirmed.

SANBORN, Circuit Judge (concurring).

The respondent is a relatively small producer of soft coal in Missouri. It sells its product exclusively in that State. A few of its customers are engaged in conducting an interstate business and use the coal in their business. Other customers ship the coal purchased by them from respondent to other States. About 34,000 tons, or 13 per cent, of the coal produced by respondent finds its way into States other than Missouri. The respondent has at all times operated its mine with nonunion labor. It employs an average of fifty men. In October, 1935, it discharged four of its employees because of their union activities. In May, 1937, the union to which they belonged filed charges against respondent with the National Labor Relations Board, based upon the discharge of these four men. The respondent, contending that its activities were purely intrastate, challenged the jurisdiction of the Board. The Board took jurisdiction, and the order which is the subject of this proceeding followed.

While I can readily understand why the discharge by the respondent in the year 1935 of these four employees for union activity presented a situation with which the State of Missouri, in the exercise of its police power, might properly have concerned itself, I am not able to comprehend why the problem presented was one of national concern, or how the separation of these men from the respondent's service could have had or could now have any appreciable effect upon commerce between the States, or how it could as a practical matter be regarded as a menace to such commerce. I agree, however, that no other conclusion than that reached by Judge WOODROUGH could be sustained, in view of the decision of the Supreme Court in the case of National Labor Relations Board v. Fainblatt et al., decided April 17, 1939, 59 S.Ct. 668, 83 L.Ed. ——. The respondent seeks to distinguish that case from this, but its argument in that regard is not convincing, particularly when considered in the light cast upon the Fainblatt decision by the Justices who dissented and who were in a far better position to appraise its significance than we are.

I prefer, however, not to concur in so much of the reasoning of the opinion in the case before us as attempts to show that a matter which, to my mind, under the record presented, was local and exclusively subject to the jurisdiction of the State of Missouri, was in fact one of national concern. I therefore concur in the result only, and base my concurrence upon the Fainblatt case.