## NATIONAL LABOR RELATIONS BOARD v. FALK CORPORATION.

### No. 6707.

Circuit Court of Appeals, Seventh Circuit.
March 7, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Mortimer B. Wolf, A. Norman Somers, and Norman F. Edmonds, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Leon B. Lamfrom and A. J. Engelhard, both of Milwaukee, Wis., for respondent.

Frank P. Burke and Giles F. Clark, both of Milwaukee, Wis., for intervener, Independent Union of Falk Corporation.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

Respondent is a Wisconsin corporation operating a plant in Milwaukee which employs about 1,400 employees. A labor organization known as the Amalgamated Association of Iron, Steel and Tin Workers of North America, Lodge No. 1528, in 1937, preferred charges of unfair labor practices against respondent with the National Labor Relations Board. These charges, after investigation, resulted in the National Labor Relations Board's filing a complaint against respondent, which, in turn, filed its answer wherein it denied all charges of unfair labor practices. A somewhat lengthy hearing was had before a trial examiner designated by the Board. He made and filed a report wherein he found against respondent. He reported respondent had engaged in, and was engaging in, unfair labor practices within the meaning of section 8 (1), (2), and (3) of the Act[1] and recommended that it cease and desist therefrom, and further that it take certain affirmative action to remedy these alleged unlawful practices. The ex-

[1] 29 U.S.C.A. § 151.

"It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

Section 8(1), (2), (3), Title 29 U.S.C.A. § 158(1–3).

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to sec-

aminer also found that respondent had not violated section 8 (5) of the Act. Respondent and the Independent Union of Falk Employees, hereinafter termed the Independent, filed exceptions to the examiner's report. The Board took up the matter, heard oral arguments, received briefs, and later, on April 18, 1938, made and filed a decision which set forth its findings of fact and conclusions. It also entered an order directed to respondent and injunctional in character.

Petitioner seeks from us, an order of enforcement of its order against respondent, as provided for in section 10 (e) of the Act.

EVANS, Circuit Judge.

Respondent has greatly narrowed the controverted issues by conceding the interstate character of the business transacted by it, the jurisdiction of petitioner over it, and the existence of a labor dispute such as falls within the purview of the National Labor Relations Act.

It squarely meets the fact issue and unequivocally denies that it ever engaged in unfair labor practices. As a result, the sole question before us is the sufficiency of the evidence to support the findings of the examiner which were approved by the Board. In short, we are to ascertain whether respondent engaged in unfair labor practices such as are condemned in section 8 (1) and (2). Specifically we are asked to determine whether the evidence supported the finding that (1) respondent interfered with, restrained, or coerced its employees in the exercise of their right to self-organize, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or in mutual aid or protection or that (2) respondent attempted to dominate or interfere with the formation or adminis-

tration of a labor organization in which its employees, or some of them, were members or about to become members.

The quantum of proof necessary to sustain a finding by the Board was defined in the recent decision of National Labor Relations Board, Petitioner, v. Columbian Enameling & Stamping Co., Inc., Respondent, 59 S.Ct. 501, 83 L.Ed. ——, decided February 27, 1939. There, it was said:

"Section 10 (e) of the Act provides: '* * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' Consolidated Edison Co. of New York v. National Labor Relations Board, supra, 59 S.Ct. [206] 217 [83 L.Ed. ——], and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

The pronouncement of the test to be applied by a reviewing court to ascertain whether a finding by the National Labor Relations Board "is supported by the evidence" appears in another late case, decided December 5, 1938, Consolidated Edison Co. of New York v. National Labor Relations Board, 59 S.Ct. 206, 216, 83 L. Ed. ——. There, the court said:

"* * * The companies contend that the Circuit Court of Appeals [2 Cir., 95 F. 2d 390] misconceived its power to review the findings and, instead of searching the

---

tion 6(a) [section 156 of this title], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.
"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act [chapter], or in sections 701 to 712 of Title 15, or in any code or agreement approved or prescribed there-

under, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this chapter as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a) [section 159(a) of this title], in the appropriate collective bargaining unit covered by such agreement when made."

record to see if they were sustained by 'substantial' evidence, merely considered whether the record was 'wholly barren of evidence' to support them. We agree that the statute, in providing that 'the findings of the Board as to the facts, if supported by evidence, shall be conclusive,' section 10(e), 29 U.S.C.A. § 160(e), means supported by substantial evidence. Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 147, 57 S.Ct. 648, 650, 81 L.Ed. 965. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989; National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13, 15; Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 760. We do not think that the Circuit Court of Appeals intended to apply a different test. In saying that the record was not 'wholly barren of evidence' to sustain the finding of discrimination, we think that the court referred to substantial evidence. Ballston-Stillwater Knitting Co. v. National Labor Relations Board, supra.

"The companies urge that the Board received 'remote hearsay' and 'mere rumor.' The statute provides that 'the rules of evidence prevailing in courts of law and equity shall not be controlling.' The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. Interstate Commerce Commission v. Baird, 194 U.S. 25, 44, 24 S.Ct. 563, 568, 48 L.Ed. 860; Interstate Commerce Commission v. Louisville & Nashville R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431; United States v. Abilene & Southern Ry. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 569, 68 L.Ed. 1016; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 442, 50 S.Ct. 220, 225, 74 L.Ed. 524. But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence."

The substance of the Board's findings is set forth in the margin.[2]

---

2 The respondent is a Wisconsin corporation engaged in the design, production, sale and distribution of steel castings, gears, speed reducers, and various other products. 65% of its raw products come from outside the state; 75% of its sales are to points outside the state.

The Steel Committee is the authorized bargaining agent of the Amalgamated Association, which is an affiliate of the C. I. O. The Operating Engineers local is an affiliate of the A. F. of L. The Independent Union is a company union.

There was no employee representation prior to 1933. After the enactment of the N. I. R. A. a Works Council was set up at the suggestion of Harold Falk, vice-president of respondent, who advised the employees "that it would be inadvisable to choose an outside organization and that the respondent would not allow a closed shop." Ballots cast for outsiders were not counted. The chairman and secretary of the Works Council were appointed by the management. Employee representatives were paid for time spent at Works Council meetings. The Works Council held its last meeting April 8, 1937 because it was thought in conflict with State and Federal legislative policy against company dominated unions. There was testimony that Harold Falk

at this last meeting told them that they could form an independent union on the company's property but would have to thereafter meet off the property. Falk stated he said that another company was having difficulty between the C. I. O. and A. F. of L. unions; that the pay raise which had theretofore been agreed upon to become effective June 1, 1937 would stand only so long as the Works Council stood, and if it fell, new negotiations would have to be had.

Members of the Works Council met April 12, 13 and 14 in the plant. Falk talked concerning the Wagner Act at the April 12 meeting, and agreed to advance the pay raise from June 1, to May 1, to show the company's good faith—it is argued it was made to keep the C. I. O. out of the plant, and to influence the choice of the labor organization to be selected.

Employees sent for Harold Falk to talk at a meeting on April 13, but he was not available. Connell, a vice-president, told them that under the Wagner Act he could not advise them. After the meeting some of the men met Harold Falk and he told them it was all right to go ahead with the inside union. He denied he also told them to work quickly because the C. I. O. was working in the

In support of the finding petitioner relies on the following alleged acts by respondent's managerial forces as indicative of an intent to prevent the free exercise of the employees' right to organize for collective bargaining.

1. Respondent's hostility to outside labor organizations.

plant. The Committee decided to get an attorney and on suggestion of Falk hired Attorney Burke. Falk made the appointment to confer with Burke. There was evidence of agreement to conceal who suggested the attorney. A committee conferred with Burke on April 14. The Independent had a meeting on April 18, and the leaders on being questioned as to who suggested Attorney Burke did not disclose the truth. The Board interprets this secretiveness to mean that the organizers of the Independent realized the company's domination and feared a disastrous effect would follow its disclosure. The meeting in effect adopted the committee's conclusion made at its meeting with Burke to run along as an association and incorporate later. They incorporated after an intimate talk between three employees and the attorney. The three employees signed the articles of incorporation although without authority so to do. They were filed April 20, 1937. The company was notified and told that about 400 employees were members, and requested a meeting for collective bargaining. The meeting was held April 23 with the three employees present. The company required no proof other than the statement of the incorporators that they were authorized representatives of a majority of the employees.

Amalgamated and Independent conducted an intensive campaign during March, April and May; the foremen expressed their hostility to C. I. O. and preference for inside union; they said the management had ordered them not to express opinions on the subject, but admitted that they had expressed their opinion.

The operating engineers at the same time were attempting to organize a smaller group of employees, in the powerhouse. They succeeded in getting applications from 14 or 17 employees, but Mr. Falk talked with these men, and not one showed up at a meeting of the union. Falk had sent them a letter stating he was not in favor of a union. Letters of withdrawal from the union were sent in by five engineers; these letters were prepared in the office of the attorneys for Independent.

The Board concluded that the Independent was directly attributable to the activities of respondent. Respondent's antipathy to outside unions was known to the employees. The hasty recognition of the Independent enabled the respondent to utilize it within two weeks as a pretext for denying collective bargaining to the Amalgamated.

These are the acts relied on to show respondent dominated and interfered with the formation and administration of the Independent and contributed support to it and thereby interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in Section 7 of the Act.

The Board ordered an election by the powerhouse employees to determine if they wanted to belong to the separate unit of the Operating Engineers or to the larger unit of production employees under the Amalgamated.

The Board dismissed the charge in the petition that there was a violation of section 8(5) charging refusal by the company to bargain collectively with the Amalgamated around May 5, 1937, because the records show that Independent had from 693 to 800 members out of about 1,316 employees, and therefore Amalgamated did not prove it represented a majority of the employees.

The Board found that the respondent dominated and interfered with the formation and administration of the Independent and contributed support to it; and used the Independent as a weapon to prevent the employee's right to self-organize. It ordered the withdrawal of all recognition of the Independent.

Inasmuch as this matter affected commerce the Board ordered an election to determine the appropriate bargaining unit and the representation of employees.

Conclusions. The Steel Workers Committee, Amalgamated Association, Operating Engineers, and Independent Union are all labor organizations within meaning of Sec. 2(5).

The respondent is engaged in unfair labor practices under Sec. 8(1) by interfering with employees' right to self-organization; it is engaging in unfair labor practices within Sec. 8(2) by contributing support to and dominating formation of Independent; and these two matters constitute unfair labor practices within meaning of Sec. 2(6) (7) of the Act. A question affecting commerce has arisen concerning representation of employees within meaning of Sec. 9(c) and Sec. 2(6) (7).

Order. Respondent and its officers are ordered to cease and desist from dominating Independent or any other labor organization of its employees and contributing

2. Respondent's action in anticipating state and national legislation by creating a Works Council, an employee organization, which it controlled through the appointment of its chairman and secretary. Its control and domination of this inside labor organization were manifested by warnings to the employees by the personnel manager that no employee was to vote for "any outsider." On one occasion when this direction was ignored, a second election was ordered and employees told "not to waste their time" on outsiders as all ballots for them would be destroyed. The employees were also notified that the company would not bargain with an outsider. The structure and functioning of the Works Council demonstrated its continuance would violate section 8 (2) after such legislation was enacted.

3. The dissolution of the Works Council was used by respondent as a means of entrenching the Independent as its successor.

4. Respondent used an offer of wage increase as a lever to discourage connection with outside organizations. Supporting this assertion petitioner points to a statement by the vice-president, made on the occasion of the dissolution of the Works Council, that a general increase scheduled for June 1 would be advanced to May 1, presumptively for the purpose of preventing an outside organization—the C. I. O. or the A. F. of L.—from organizing the company's employees. This alleged reference to the C. I. O. and A. F. of L. is denied by Falk.

5. The management took the initiative in organizing and launching the Independent after learning that the Works Council could no longer be maintained.

6. In promoting and organizing the Independent, respondent played a dominating part; the personnel manager actively participated in arranging for the meeting, distributing notices thereof; his activities and attitude as disclosed by a statement that he believed it was the *business of the company* to see to the notification of employees of the meeting for the purpose of organization of the Independent; the superintendents and foremen caused or "saw to it" that employees attended the meeting and gave the employees to understand that the Independent had the backing or approval of the company.

7. The meeting of April 12 was held upon the company's grounds. At the meeting to ascertain whether the Independent should be organized to take the place of the Council, the management announced that it would advance the date of the increase in wages if the employees immediately joined the Independent. The advance from June 1 to May 1 as the effective date of increase in wages was inconsistent with the management's previous assertion that the prices for the new orders would go into effect June 1.

8. Respondent selected an attorney who thereafter was more solicitous of respondent's wishes than he was of the welfare of the employees.

9. Respondent paid the organizers their regular hourly wage for the time spent at the meetings leading up to the organization of the Independent as well as for the time spent in conferences with Burke, the attorney selected by respondent. It is true that later these amounts were deducted from the organizers' pay on advice of counsel for the respondent, but not until after the Independent was organized and recognized by respondent as the sole bargaining agent. Failure to inform the employees of the selection of Burke by the management indicated an intent to conceal.

10. Respondent's recognition of Independent as exclusive agent without ascertaining whether it represented the majority and its refusal to bargain with an outside union that claimed to represent a majority. Respondent used its influence to overcome a majority of the Engineers who had previously requested recognition as representatives of the men employed in the power house. The management consistently made known its preference for the Independent and assisted in distributing cards, and the supervisory staff consistently resorted to action which would in-

support to any such organization; from interfering with their employees' right to self-organization; collectively bargain; to withdraw all recognition from the Independent as the bargaining agent of its employees; to immediately post notices in conspicuous places in its plant stating that it will cease and desist as aforesaid, and that it has completely disestablished Independent as representative. The complaint is dismissed so far as it alleges unfair labor practices under Sec. § (3) in discharging Anton Kinch, and in so far as it alleges that the respondent has engaged in an unfair labor practice under Sec. 8(5).

dicate hostility to unions and in particular to outside unions.

The foregoing constitutes the basis of the Board's findings. The examiner believed the charges to be true. So did the Board.

■ We are satisfied that some of these charges were explained satisfactorily by the respondent. Others, standing alone, afford no support for the Board's conclusions, if true. For example, we are convinced that respondent was innocent of any intention to influence action when it permitted the use of its premises as a meeting place of its employees. Moreover, it corrected its action in paying members of the committee who were perfecting the organization of the Independent during working hours, after it learned that such payments might be construed as an act of preference towards Independent. This deduction from the employees' wage was after the organization had been perfected, but it impresses us as indicative of fair treatment of employees who were losing time attending meetings preliminary to organizing a union. It indicates the respondent was anxious to comply with the letter and the spirit of the law. We fail to find in these payments of a few hours' committee work any evidence of attempted domination of employees' choice of union.

■ Likewise, we can see nothing to criticize in Mr. Falk's action expressing a preference for a local over an outside union. Especially is this true, where the employee asks the employer for advice. There is much evidence in this record which is indicative of a very wholesome cooperative spirit existing between management and employees. Surely, it is desirable and bespeaks the confidence of employees in the management to have the old employees ask the executive officer of the employer to express his views and his labor union preference.

On the other hand, the position of the employer is a most delicate one. Surely, he has the right to his views. And the right to entertain views is rather valueless if it be not accompanied by the right to express them. And this right to express his views is clearer when they are expressed in response to an interrogatory by one of his employees. And yet, the voice of authority may, by tone inflection, as well as by the substance of the words uttered, provoke fear and awe quite as readily as it may bespeak fatherly advice. The position of the employer, where, as here, there is present, genuine and sincere respect and regard, carries such weight and influence that his words may be coercive when they would not be so if the relation of master and servant did not exist.

■ It must be understood that we are not the fact-finding body.

■ Review of a discretionary order of an administrative body is quite different from the court's exercise of discretion in the first instance. Our duty is to ascertain whether there is substantial evidence to support the charges found by the Board.

■ We are satisfied that such evidence appears in the record. Not only does it appear, but taken as a whole it rather conclusively points to the findings made by the Board. If certain testimony be accepted as true, and we are not prepared to reject it, the conclusion is inescapable that respondent was and is strongly and outspokenly opposed to a closed shop; that it earnestly endeavored to prevent the unionizing of its employees and when the inevitable became imminent, it sought to dominate the formation, organization, and activities of the union least objectionable to it. It thereby interfered with the employees' free right to self-organization which is in violation of section 8(1) and (2).

Respecting the right of the employee to unionize and to be free of employer influence in so doing, Congress has spoken and the court has sustained the legislation. The language of the court has put at rest any doubt which respondent may have previously entertained. It said (National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S. Ct. 615, 622, 81 L.Ed. 893, 108 A.L.R. 1352):

"Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent legislative authority."

The court further said (page 42, 57 S. Ct. page 626):

"Experience has abundantly demonstrated that the recognition of the right

of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances. The opinion in the case of Virginian Railway Co. v. System Federation No. 40, supra [300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789], points out that, in the case of carriers, experience has shown that before the amendment, of 1934, of the Railway Labor Act [45 U.S.C.A. § 151 et seq.] 'when there was no dispute as to the organizations authorized to represent the employees, and when there was a willingness of the employer to meet such representative for a discussion of their grievances, amicable adjustment of differences had generally followed and strikes had been avoided.' That, on the other hand, 'a prolific source of dispute had been the maintenance by the railroads of company unions and the denial by railway management of the authority of representatives chosen by their employees.' "

■ *Order to Post Notices.* The Board ordered the respondent to post notices for thirty days, stating that it "will cease and desist" doing the acts prohibited by the order, and that it has withdrawn all recognition of the Independent Union as the representative of its employees for the purpose of dealing with it.

Objection is made to this order on the ground that it is compelling the respondent to make a public admission of guilt. In support of its requested modification of the Board's order, respondent cites National Labor Relations Board v. Abell Co., 4 Cir., 97 F.2d 951, 958, where the court relieved the employer from that part of the order which required the posting of such a notice. We are convinced however that this case can not serve us as precedent, but

that in a matter of this kind, each decision must rest upon the facts of the individual case.

It is argued that the posting of such a notice containing a statement that it will cease and desist from prohibited actions in the future implies that respondent has indulged in such practices in the past.

We differ with the Fourth Circuit's conclusion in that we do not draw the inference from an *enforced* compliance with an order which required the employer to state it *"will* cease and desist" from enumerated practices, that it is thus making an admission, voluntary or involuntary, that it has in the *past* been guilty of such practices. The purpose of the notice is to convey to the employees the knowledge of a guarantee of an unhampered right *in the future* to determine their own labor affiliation. The very fact that the company resists the enforcement of the "cease and desist" order is evidence not of admission or acquiescence in a determination of guilt, but of a contrary belief on the part of the employer.

The factual controversy having been settled officially and judicially, the losing party submits and as a good loser complies with the terms fixed by the order of the fact finder. It not only should submit to the finding of the arbiter, it must do so. That is the logic of the situation. Moreover, the findings are against the respondent. The final order disposing of any case must be on the basis of the determinative findings, not on an attempt to mollify the losing party. It is hardly necessary for us to observe that our opinion is not to be construed as denying to the employee the right to organize or join an independent union as readily as an organized union. The employees must be perfectly free at all times, and this means *in the future,* to select the union they prefer.

We conclude that the order of the Board is valid and that its petition for enforcement should be, and is hereby, granted.