MONTGOMERY WARD & CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.
No. 6826.

Circuit Court of Appeals, Seventh Circuit.
Nov. 7, 1939.

Rehearing Denied Dec. 8, 1939.

John A. Barr, R. F. Walker Smith, and Stuart S. Ball, all of Chicago Ill. (Clarence J. Young, of Portland, Or., of counsel), for petitioner.

Ernest A. Gross, of Washington, D. C., Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Mortimer B. Wolf, Bertram Edises, and David Persinger, Attys., National Labor Relations Board., all of Washington, D. C., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This case is here on petition by Montgomery Ward & Co., Inc. (hereinafter

also referred to as the "employer," "Ward," "petitioner," or "Company"), to review and set aside, and on request by the National Labor Relations Board for the enforcement of, an order of the National Labor Relations Board (hereinafter also referred to as the "Board"). Secs. 10(c) and (f), National Labor Relations Act. Title 29 U.S.C.A. § 160(c) and (f), 49 Stat. 453.

Upon a charge filed by members of the Weighers, Warehousemen and Cereal Workers' Local No. 38-123 of the International Longshoremen's Association (hereinafter also referred to as the "Union"), affiliated with the American Federation of Labor, the Board issued its complaint against Ward, which, as amended, charged in substance that the company had coerced the employees in the exercise of their right to self-organization in violation of Section 8(1) of the Act, interfered with the formation of a labor organization among its employees in violation of Section 8(2), refused to bargain with the Union in violation of Section 8(5), and discriminately discharged 52 of its employees in violation of Section 8(3). Title 29 U.S.C.A. § 158(1), (2), (3), (5), ch. 372, 49 Stat. 452, 453.

After the hearing, the Board made the following findings of fact: The company had interfered with self-organization among its employees by uttering anti-union statements and employing detectives to investigate union activities, thereby violating Section 8(1); it had discriminated against 23 of its employees in regard to hire and tenure of employment, thereby discouraging membership in the Union and violating Section 8(3); it had not discriminated against the remaining 29 named employees; and it had not violated Sections 8(2) and 8(5) of the Act.

Upon the foregoing findings of fact, the Board based the following cease and desist order: 1(a) Cease and desist from discouraging membership in the Union by discriminating in regard to hire and tenure of employment; 1(b) cease and desist from employing detectives to investigate the union activities among the employees; 1(c) cease and desist from in any other manner interfering with the employees in the exercise of their right to self-organization and representative collective bargaining.

In order to carry out the policies of the Act, the Board ordered the following affirmative action: 2(a) Offer the 23 employees reinstatement to their former positions, placing upon a preferential list those for whom employment was not immediately available; 2(b) make whole each discharged employee for any loss of pay by reason of the discrimination; 2(c) post notice of obedience to the cease and desist order; 2(d) keep such notices posted for 30 days; 2(e) notify Board of compliance.

Ward acquiesced in all but Section 1(a), 2(a), and 2(b) of the Board's order. The non-complied portion of the order was based squarely on the Board's finding of fact that Ward had discriminatorily discharged 23 employees in order to discourage membership in the Union. On this issue Ward filed its petition for review in this court and urged the setting aside of the above described portion of the order on two grounds, namely, that the Board failed to consider material evidence and that the finding of anti-union discrimination against 23 employees was not supported by substantial evidence.

The record on review devoted 427 pages and at least 41 exhibits to the individual personnel records of 22 of the 23 employees ordered rehired and the personnel survey sheets of the freight elevator, receiving, shipping, and warehouse No. 3 departments of the plant. The personnel record cards revealed the history of the particular employee with the company and indicated whether in the past he had been considered satisfactory by Ward. The departmental survey cards disclosed the relative proficiencies of the employees retained and discharged. That this evidence is material as bearing on the selection of the employees to be discharged is not questioned.

The Board in its findings of fact stated that " * * * the respondent did not introduce any evidence proving that it had any reason, other than the policy of discharging union workers * * *, to dismiss the particular employees named in the complaint * * *." From this statement, petitioner argued that the Board completely disregarded, overlooked, or failed to consider the evidence based on the personnel records. Morgan v. U. S., 298 U.S. 468, 480, 481, 56 S.Ct. 906, 80 L.Ed. 1288.

We are not ready, in light of the whole decision of the Board, to attach the same significance to the selected quotation that petitioner does. In its decision the Board

refers several times to the personnel records, a fact which militates against petitioner's conclusion that the Board overlooked the evidence in question. Moreover, the record on review discloses clearly that the particular evidence, analyzed by the trial examiner in his Intermediate Report and forming the basis of petitioner's exceptions thereto, necessarily was brought to the attention of and considered by the Board, by virtue of the oral argument and the briefs submitted.

Even were we inclined to study the quoted matter outside its context, we believe that argument derived therefrom to the effect that the Board considered the particular evidence but found it wanting, can be advanced as seriously as the argument that the Board failed to consider the evidence. We conclude, therefore, that petitioner's argument in this regard is not sound.

■ This leaves for review the contention that the finding of anti-union discrimination against certain employees is unsupported by substantial evidence. Not long ago the United States Supreme Court defined the term "substantial evidence." Substantial evidence must be "relevant" evidence, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; it must be acceptable to a "reasonable mind" as "adequate to support a conclusion," Consolidated Edison case, supra; and it must be "enough to justify," if the trial were to a jury, "refusal to direct a verdict," National Labor Relations Board v. Columbian Enameling and Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. With this definition in mind, it is proper to state the salient facts.

Montgomery Ward & Co., Inc., is an Illinois corporation engaged in the distribution of merchandise through the media of mail order houses and retail stores. In connection with such distribution, it operates inter alia a mail order house and retail store at Portland, Oregon, where this controversy occurred. The Portland house acts as a distributing agency to about 500,000 mail order customers, 60% of whom live outside the state of Oregon, and serves as a warehousing and distributing agency for some 45 Ward retail stores, 31 of which are located outside Oregon.

Prior to November 2, 1936, no attempt had ever been made to unionize the Portland plant, which gave employment throughout the year to between 1200 and 1400 persons. Seasonal demands by Ward customers created temporary jobs for many more. For instance, in December of 1936, between 2000 and 2100 men and women were working in the Portland plant. However, this condition was temporary only, and, by December 24 of 1936, in response to the normal decline of customer demand, a seasonal reduction of the working force was made, which removed between 900 and 1100 workers from the Ward payroll.

On November 2, 1936, the Union commenced its campaign to organize the Portland mail order house. On November 6, the Union held a general mass meeting attended by over 200 Ward employees. Thereafter, a large number of employees wore Union buttons at the plant. Patton, manager of the Portland house, informed the employees that Ward would not permit any organization whatever to dictate personnel affairs. On November 9, the company distributed individual notices of a blanket wage increase retroactive to November 6, and on November 10 sent Bullock, former manager of the Portland mail order house, to assist Patton.

Then, on November 11 and 12, Bullock delivered a series of speeches to the employees, at which time he recognized their right to belong to a union. He also mentioned rumors of a closed shop and of an alleged threat of a strike, topics which had not been discussed as yet by the Union, and predicted that in the event of a strike the plant would be closed and the business given to Ward mail-order houses elsewhere. Again, on November 24 and December 7, Bullock addressed them, reading from prepared documents.

The November 24 address repeated in substance the thesis of the November 11 and 12 speeches. The December 7 address revealed familiarity with the internal affairs of the Union, which is interesting in connection with testimony extracted from witnesses adverse to the interests of the Union. These witnesses testified in effect that Ward hired detectives for espionage among its employees. These under-cover operatives, so the testimony goes, were merely assigned to discover thefts and various violations of the plant rules, but the fact stands out that they made regular reports on union activities at the plant and at the meetings. Bullock himself ad-

mitted that detectives were hired, who in covering the organizational work of the Union made reports of a "general nature" as to "whether a strike vote was taken, the number in attendance at the meeting, and who attended the meeting."

During the interval of time that transpired between the two series of speeches mentioned, Bullock held individual conferences with some of the employees, at which times he expressed his views on unionization. As to these discussions, Bullock testified in effect that his purpose was to discourage unionization in order to avert a strike. It is to be noted that up to that time no allusion to a strike had ever been made by the employees or the Union. And, as to the individual conferences, counsel for petitioner observed that Bullock may have "transgressed the permissible bounds."

In the meantime, attendance at the Union meetings had decreased noticeably. Nevertheless, the unionization, waning quickly, had taken firm hold in three departments or working units of the plant. At this point it is worth noting that at no time did the Union represent a majority of all the employees in the plant. On the other hand, of the eighteen departments in the plant, ample testimony shows heavy union enrollment in the shipping and receiving departments, and documentary exhibits and stipulated matters reveal unionization of a majority of the employees in the freight elevator department.

■ To us these facts establish a reasonable basis for the conclusion that Ward's aim and purpose was the discouragement of union membership among its employees. In saying this we have not failed to consider the sanctity that should be given to the employer's right to express his views on unionization or utter his preferences. National Labor Relations Board v. Falk Corporation, 7 Cir., 102 F.2d 383, 389; Jefferson Electric Co. v. National Labor Relations Board, etc., 7 Cir., 102 F.2d 949, 956. We are convinced, however, that the conduct and expression of the company in this case had really "transgressed the permissible bounds." To us the Bullock speeches and individual conferences manifest strong anti-union sentiment and represent an earnest effort and plan to prevent unionization of Ward employees.

These facts also constitute a reasonable basis for the conclusion that Ward had knowledge that the three departments above described had been most affected by the union activity, and knew who the union employees were therein. For instance, early in December Bullock was advised by the Union that it represented "nearly all" of the employees in the shipping and receiving departments; Ward hired one Myers, active informant on union activities, as an employee in the freight elevator department; and Ward hired detectives as ostensible employees who watched and reported the unionization campaign.

We think these circumstances spell out knowledge; one who pays for knowledge does not ordinarily reject it. To suppose otherwise is to believe that Ward used under-cover operatives to watch and report union activities and then refused to accept the reports. In passing, we may state, however, that the record is not as compelling, nor as cogent, in regard to the warehouse No. 3 department as it is in regard to the receiving, shipping, and freight elevator departments; and for this reason special consideration thereto is given later on in this opinion.

■ At this time it should be stated that the facts also show a high percentage of union members among the employees discharged in the three departments mentioned above. To be more specific, 96% of the employees discharged therefrom belonged to the Union. Stated differently, 40 of the 63 persons employed therein belonged to the Union, and 24 of the 25 discharged therefrom were union members (the 25th employee was a woman; there is evidence in the record that women were ineligible for union membership). Standing alone, this percentage evidence will not sustain an order based on Section 8(3) of the Act. But, coupled with other evidence such as is present in this case, it becomes very persuasive. Hamilton-Brown Shoe Co. v. Board, 8 Cir., 104 F.2d 49, 53.

Only in one respect is the persuasiveness of this evidence not complete in our case. That is, in another department, the packing and billing unit, the disparity was in favor of the union members. Thus, 26 of the 153 men employed therein belonged to the Union, and 7 of the 96 discharged were union members. However, in view of the evidence showing a reason for treating the three departments together and independent of the other departments, we

cannot say that the Board should not have attached great weight thereto.

Such was the situation with which the Board had to deal, and it all comes down to this. The complaint charged a discouragement of union membership by anti-union discrimination in the discharges that occurred. The following evidence, analyzed above, was adduced in support thereof: (1) A background of anti-union activity on the part of Ward, which discouraged union membership; (2) knowledge by Ward of strong union activity in three departments and of the union men therein; and (3) a high percentage of union men among the employees discharged from the three departments.

■ Clearly, the evidence adduced to support the complaint gives rise to an inference that is sufficient to support an order based on Section 8(3) of the Act. Unless "destroyed and refuted by other evidence," National Labor Relations Board v. Kentucky Fire Brick Co., 6 Cir., 99 F.2d 89, 92, the inference of discrimination is substantial and sufficient "enough to justify," if the trial were to a jury, "a refusal to direct a verdict," Columbian Enameling and Stamping Case, supra, 306 U.S. at page 300, 59 S.Ct. at page 505, 83 L.Ed. 660. See, also, Chamberlain v. Pennsylvania Railroad, 2 Cir., 59 F.2d 986, reversed, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819. This inference of discriminatory discharge leaves it up to the employer to give an adequate "explanation of the discharge," even though the burden of proof remains on the Board, since it is obvious that the reasons of the discharge "lay exclusively within its own knowledge." National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 871, 872.

As we see it, the question resolves itself as follows. Does the evidence advanced by the employer "destroy" and "refute" the evidence adduced to support the complaint? To answer this requires an application of the "tests" recently enunciated by the United States Supreme Court and described earlier in this opinion. Consolidated Edison case, supra, 305 U.S. at page 229, 59 S.Ct. at page 216, 83 L.Ed. 126; Columbian Enameling and Stamping case, supra, 306 U.S. at page 300, 59 S.Ct. at page 505, 83 L.Ed. 660.

■■ Or, does the evidence advanced by the employer merely give rise to another and inconsistent inference? If the most that can be said, after all the evidence is in and each side has rested, is that the evidence picture permits conflicting inferences, it is not enough, Texas & New Orleans Ry. Co. v. Brotherhood et al., 281 U.S. 548, 559, 560, 50 S.Ct. 427, 74 L.Ed. 1034, for the inferences to be drawn are for the Board and not the courts, National Labor Rel. Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

In its answer Ward denied that anti-union bias motivated the action complained of. In support of its answer Ward introduced the following evidence: (1) The employees discharged either inefficient or less efficient than those retained; (2) the seasonal slack in business requiring reduction in personnel; (3) the jobs in the three departments divided in eight classes or groups; and (4) a high percentage of non-union men among employees discharged from at least one other department, namely, the packing and billing department. Evidence (1) and (3) were based on the personnel records, which were described earlier in the opinion. An analysis of this evidence follows, except that evidence (4) has already been considered.

Among other things, the personnel records evidenced that the employees in question were rated as inefficient or as less efficient than those retained. If unimpeachable, such evidence might very well destroy and refute the inference that the discharges were due to union membership. In this case, however, the Board may have reasonably doubted the soundness of this evidence.

For instance, the individual personnel cards, upon which no doubt the departmental survey sheets were partially based, refer to two legends, namely, "Qualifications Needed" and "Would You Rehire." An analysis of the cards indicate that in the past, in discharging employees at seasonal periods, Ward neglected to comment as to ability under the first legend and usually wrote the word "Yes" under the second legend. In only three instances does commentation appear, two comments under a different legend and all remarks laudable in nature. On the other hand, in the 1936 discharges, Ward resorted to the extensive use of detracting comments and the usually concomitant insertion of the word "No."

Under these circumstances, it is reasonable to suppose that the Board was not impressed by the evidence of inefficiency as the cause for the discharges. In this case, too, the histories of some of the named employees, who had served Ward for a considerable length of time, militated against the import of the comments written in December of 1936. Not only had they been on the Ward payroll for a considerable period of time, but in the past they had been transferred or discharged at seasonal slack periods and rehired shortly thereafter, on which occasions the usual practice was followed of inserting the word "Yes" under the "Would You Rehire" legend and of disregarding the "Qualifications Needed" legend. Moreover, the comments made were written with a pencil and at a time shortly before the discharges.

All in all, we think that the comments and comparative ratings of the personnel records were attended by a surrounding atmosphere of suspicion, and that the Board could have reasonably discredited them as evidence of inefficiency and of justification for the discharges.

■ On the other hand, the personnel records, as evidence of employment history and as evidence of the nature of the departments and of the personnel and jobs therein, are unimpeachable and uncontradicted. The relevance of this evidence in a case of this kind is undisputed. For instance, the histories of some of the employees in question reveal considerable length of service. Now, although long service does not necessarily indicate efficiency, it does indicate that the employee's work is not considered so unsatisfactory as to merit discharge. Then, again, the classification of jobs within a department may disclose that all jobs therein are not on a comparable basis. In this case, as shall be explained soon, the presence of dissimilar or noncomparable jobs may affect the inference arising from the dismissal of a large proportion of union men.

Ward also relies on the fact that the 1936 discharges, between 900 and 1100 in number, were only the normal result of the seasonal decline of business. That Ward reduces its personnel at the end of the seasonal period is undisputed. That the jobs are abolished or discontinued permanently at this time is not so clear, and our observation in this regard comes to this.

Ward gives fairly continuous employment to between 1200 and 1400 people, who may be called the regular employees. Our impression from the record is that it is not unusual for regular employees to be removed from the pay-roll for some or all of the slack that occurs between seasonal periods. On these occasions they are laid off, given leaves of absence, or discharged and rehired. Now, prior to the discharges in question, Ward was employing between 2000 and 2100 people, some of whom evidently were not regular employees. Then, on December 22 and 24 of 1936, between 900 and 1100 persons were discharged.

From the statistics mentioned above, it is clear that between 200 and 300 persons discharged belonged to the regular group of employees, and, in absence of peculiar circumstances and in the normal course of events, they would naturally expect to be, and in fact would be, placed back on the pay-roll. It is to be noted in this connection that some of the employees named in the complaint had worked for Ward in the past. A fair inference would be that normally these would be included in the 200-300 persons who would shortly find themselves on the pay-roll. From what has been said, and in view of the anti-union background, it seems to us that the evidence pertaining to the seasonal reduction of personnel emphasizes the inference above described more than it purges Ward of anti-union motives.

■ However, in this regard, even assuming an anti-union background, evidence that particular jobs were discontinued, and that no replacement employees had been hired thereon, would tend to show that the discharges respecting these jobs were not discriminatory. That such evidence may constitute a defense to the charge of discrimination under Section 8(3) of the Act has been recognized by the Board. In the matter of Acme Air Appliance Company, Inc., et al., 10 N.L.R.B., No. 123; In the matter of Mt. Vernon Car Manufacturing Co. et al., 11 N.L.R.B., No. 46.

Ward also relies on the fact that the jobs in the freight elevator, receiving, and shipping departments were divided into eight classes or groups. Counsel for petitioner devoted considerable attention to this evidence both in his brief and at the oral argument. The thesis of the argument based thereon is that it adds to the burden

of proof to be met by the Board, in other words, that the evidence pertaining to the classification of the jobs strikes at and undermines the logic and foundation of the percentage evidence, i. e., the evidence that an unduly high percentage of union men were dismissed from the three departments in question.

To grasp petitioner's argument fully, it would be better to describe the effect of the classification evidence adduced by Ward. The receiving department employed 34 employees, whose jobs were grouped into three classes.[1] Ward decided to release 11 of them, all of whom belonged to the Union. In doing this, Ward retained 23 employees. Although we know that 14 of these retained are non-union men and 9 union men, not one of them is individually identified as a non-union or union man.

The shipping department employed 17 employees, whose jobs were grouped into three classes.[2] Ward decided to release 6 of them (a seventh employee had voluntarily resigned), five of whom belonged to the Union (the other released was a woman; there is evidence in the record that women were ineligible for union membership). In doing this, Ward retained 10 employees. Although we know that· 5 of these retained are non-union men and 5 union men, not one of them is individually identified as a union or non-union man, except that one employee in class (3) is necessarily a non-union man.

The freight elevator department employed 12 employees, whose jobs were grouped into two classes.[3] ·Ward decided to release 8 of them, all of whom belonged to the Union. In doing this, Ward retained 4 employees. We know that 3 of these retained are non-union men and the other is Myers, the union informant who can not be classed as a union man, even though he had joined.

In summarizing the classification, we observe the following results. In the receiving department, the individual employees retained are not individually identi-

---

[1] The following symbols are used throughout in the footnotes: Released √; Retained R; Union Man U; Non-Union Man N; Ordered Rehired $\pi$; Formerly Employed E.

*Receiving Department:* 34 E; 11 √ U; 9 R U, 14 R N.

| | | | |
|---|---|---|---|
| Class (1): | 11 | Special or noncomparable jobs. | |
| | 1 | Supervisor | R |
| | 4 | Truckers | R |
| | 1 | Record Clerk (Woman) | R |
| | 2 | Copy Typists (Women) | R |
| | 1 | Timekeeper (Woman) | R |
| | 1 | Freight Shed Checker | R |
| | 1 | Claim Clerk | R |
| Class (2): | 6 | Merchandise Checkers. | |
| | 4 | | R |
| | 2 | | √U$\pi$ |
| Class (3): | 17 | Receiving Clerks. | |
| | 8 | | R |
| | 8 | | √U$\pi$ |
| | 1 | | √U reinstated |

[2] Shipping Department: 17 E; 6 √ (5 U); 5 R U, 5 R N.

| | | | |
|---|---|---|---|
| Class (1): | 4 | Special or noncomparable jobs. | |
| | 1 | Supervisor | R |
| | 1 | Record Clerk (woman) | R |
| | 1 | Copy Typist (woman) | √ |
| | 1 | Trucker | √U |
| Class (2): | 4 | Merchandise Sorters. | |
| | 2 | | R |
| | 2 | | √U$\pi$ |
| Class (3): | 9 | Freight Clerks. | |
| | 6 | | R |
| | 2 | | √U$\pi$ |
| | 1 | | Voluntarily Resigned |

[3] Freight Elevator Department: 12 E; 8 √ U; 3 R N, 1 R (Myers).

| | | | |
|---|---|---|---|
| Class (1): | 1 | Special or noncomparable job. | |
| | 1 | Trucker | R N |
| Class (2): | 11 | Elevator Operators. | |
| | 2 | | R N |
| | 1 | Myers | R |
| | 6 | | √U$\pi$ |
| | 2 | | √U reinstated |

fied as non-union or union men, although the evidence shows that 9 belong to the union and 14 do not. In the shipping department, the individual employees retained are not individually identified as non-union or union men, although the evidence shows that 5 belong to the Union and 5 do not, and although from the evidence it follows that at least 1 employee retained in class (3) is a non-union man. On the other hand, in the freight elevator department, the employees retained are individually identified as non-union men. The thought expressed here is that since the record is silent as to the union affiliation of the individual employees in the classes of the receiving department, and in classes (1) and (2) of the shipping department, we must proceed on the theory that the employees retained therein were union men.

To complete the evidence picture, it might be well to note what occurred in the 3 departments after the discharges. New men were added, who were either non-union or if they had ever been union members they had dropped out of the union at the time of the discharges. In the freight elevator department, 6 additional men were put on.[4] In the receiving department, 9 additional men were put on.[5] And, in the shipping department, 2 additional men were put on.[6] In connection herewith, and in view of our analysis earlier in the opinion, it should be remembered that Ward had failed to show that the employees released were less efficient than those retained.

Counsel for petitioner argues at great length that the classification evidence destroys and refutes the percentage evidence in this way: discrimination cannot exist except between employees doing comparable work; proof of discrimination under Section 8(3) of the Act is made by showing (1) that union men were discharged and (2) that non-union men holding comparable jobs were retained; the classification evidence allows the jobs in the three departments to be divided into 8 classes; once this occurs, the record permits the possibility that the men retained in each class are union men (this is not true as far as the classes in the freight elevator department and class (3) of the shipping department are concerned); therefore, so the argument goes, discrimination is not proved, since on the record as it stands the Board only proved element (1) and failed to prove element (2).

If proof of discrimination were confined solely to the situation above described, or if the term "discrimination" means a differentiation between employees doing comparable work, we would be inclined to give more serious attention to the argument of counsel. It is our opinion, however, that the term "discrimination" as used in Section 8(3) of the Act takes on a meaning wider than counsel would have us believe. For instance, to adopt his meaning is to exclude the situation where the employer discharges an employee because of his union activity and replaces him with a non-union man, a form of discrimination not at all unusual and condemned by Section 8(3).

Were we content to rest here and say that proof of discrimination under the Act is confined to the two situations mentioned, we would be prepared to state that the Board has proved its case as to the classes in the freight elevator and as to class (3) of the receiving and shipping departments. However, we are reluctant to so confine the scope of Section 8(3) to the enumerated factual situations, and we refrain from adopting any definition of the term "discrimination" that would circumvent the objective of Section 8(3), namely, the prohibition of employer conduct discouraging union membership.

Let us illustrate what we mean when we say that to accept counsel's definition of the term "discrimination" would be in many cases to permit conduct prohibited by Section 8(3) of the Act. Assume a union employee holding a noncomparable job: discrimination is shown under the Act if the employer, in discharging him because of

---

[4] The 6 additional men were added to class (2), from which the Union employees had been discharged. Two of the 6 men were reinstated union employees, who had stopped attending the union meetings. Of course, no one was added to class (1), consisting of one job, for no one had been discharged therefrom.

[5] The 9 additional men were added to class (3), or to classes (2) and (3), from which the union employees had been discharged. One of the 9 men was a reinstated union employee. Of course, no one was added to class (1), consisting of 11 special jobs, for no one had been discharged therefrom.

[6] The 2 additional men were added to class (1), (2), or (3), or classes (1) and (2), or classes (1) and (3) or classes (2) and (3).

his union affiliation, effects thereby a discouragement of union membership. Assume a union employee holding a comparable job: discrimination is shown under the Act if the employer, in discharging him because of his union affiliation, effects thereby a discouragement of union membership. Incidentally, the discrimination may take various forms, e. g., that of favoring a retained non-union employee, that of replacing a union employee with a new man, and that of discontinuing the job without necessarily favoring a retained non-union employee or a replacement worker.

■■■■ Our observations on this point, therefore, come to this. We believe that the term "discriminaion" takes its meaning from the context of Section 8(3), and that it refers to anti-union discrimination, that is, to a different treatment accorded union employees solely because of their union memberships or activities and without reference to whether they hold comparable or noncomparable jobs. To restate and summarize, Section 8(3) prohibits certain employer conduct, namely, the discouragement of union membership by means of anti-union discrimination. It directly protects union membership, and it indirectly protects employees engaged in lawful union activities from discharges that would effect a discouragement of union membership. See National Labor Rel. Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. Sands Mgf. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682.

In passing, we state our belief, in view of what has just been said, that Ward's classification evidence does not refute and destroy the evidence adduced by the Board. We fail to see how division of the departments into eight classes of jobs affects the percentage evidence in this case. Of the 63 union and non-union employees in these eight classes, 24 out of 25 discharged or 96% were union members. Now, add to this percentage evidence the following evidence: (1) a background of anti-union activity on the part of Ward, which discouraged union membership; (2) knowledge by Ward that the eight departmental classes were strongly affected by unionization; (3) espionage directed toward the identity of union members; (4) the point that Ward was unable to show that the employees released were less efficient than those retained; (5) the point that evidence of seasonal slack of business as requiring a reduction of personnel was subject to an inference in favor of some of the discharged employees; and (6) the hiring of non-union men to replace the union men discharged.

We now consider seriatim the various departments and individuals involved.

*Receiving, Shipping, and Freight Elevator Departments.*

■■■ We have finished our discussion on the soundness and effect of all the evidence adduced in this case, and of the inferences which reasonably may be drawn therefrom. As to these departments, or the classes therein, it is evident from what has been said that the evidence adduced by Ward did not have the effect of destroying and refuting the evidence adduced in support of the complaint. Moreover, Ward's evidence was unsatisfactory in one regard and subject to conflicting inferences in another regard.

On the other hand, we are prepared to state that the Board's evidence, upon which the inference of discriminatory discharge is based, is substantial and sufficient enough to justify a refusal to direct a verdict, if the trial were to a jury. As to these departments, therefore, we believe and conclude that the findings of the Board are supported by the evidence. Consequently, the order of the Board, based thereon, is ordered enforced.

*Warehouse No. 3 Department.*

Earlier in the opinion we undertook to point out the evidence that justified the separate treatment given to the receiving, shipping, and freight elevator departments. Among other things, Myers (the Union informant) worked in the freight elevator department, the Union itself notified Ward as to its strength in the receiving and shipping departments, and 24 of the 25 employees discharged from the three departments belonged to the Union.

On the other hand, nowhere in the record is there cogent evidence that Ward had knowledge that the warehouse No. 3 department was strongly affected by unionization. As to this department, the sole fact of espionage in a plant employing between 2000-2100 during the unionization campaign is no more compelling than it is with reference to the 14 departments other than the receiving, shipping, and freight elevator departments.

Moreover, in this department, 3 non-union and 3 union men were employed by Ward. When the discharges came, 4 of them were affected: 2 union and 1 non-union man were released, and 1 non-union man was given a leave of absence. Since the discharges, 1 union and 1 non-union man have been working there, and no additions to the force have occurred. Significant is the fact that after as well as before the discharges, the percentage of union men employed remained the same. On such evidence, we are moved to conclude that the Board has failed to prove its case. Consequently, the order of the Board, based on findings unsupported by the evidence, is reversed.

*The Discharge of Arthur Morey.*

The Board also ordered the reinstatement of one Arthur Morey, employed by Ward as a radio technician. The discharge of Arthur Morey has been separately treated, and has no connection with the discharges and disposition thereof made in the 4 departments already mentioned. In view of the principles followed in this opinion, we believe and so state that the following evidence pertaining to the discharge of Arthur Morey is substantial and sufficient enough to justify a refusal to direct a verdict, if the trial were to a jury: (1) A background of anti-union activity on the part of Ward, which discouraged union membership; (2) knowledge by Ward that Morey was an active union member; (3) the exceptional ability and capacity of Morey; and (4) the hiring of a new man to occupy the job formerly held by Morey.

Ward sought to show justification for the discharge by introducing evidence that the reduction in personnel required the action taken, and that Morey was displaced in order to provide a place for an employee older in service. The effect of this evidence was completely destroyed by Ward's subsequent action in hiring a new employee to take over the very job formerly held by Morey. We conclude, therefore, that the Board's finding of discriminatory discharge is supported by the evidence, and the order based thereon will be enforced.

The order of the Board will be modified in accordance with this opinion, and as thus modified and construed, the order of the Board is enforced.