## NATIONAL LABOR RELATIONS BOARD v. W. A. JONES FOUNDRY & MACHINE CO.

### No. 7690.

Circuit Court of Appeals, Seventh Circuit.

Nov. 5, 1941.

Robert B. Watts, NLRB, of Washington, D. C., I. S. Dorfman, NLRB, of Chicago, Ill., and Allan R. Rosenberg, NLRB, of Washington, D. C., for petitioner.

David R. Clarke, John Harrington, and Albert J. Smith, all of Chicago, Ill., for respondent.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

This matter comes before the court on a petition of the National Labor Relations Board, hereinafter called the Board, for the enforcement of an order entered March 31, 1941, against the respondent, hereinafter referred to as the Company, pursuant to Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c).

The Company is an Illinois corporation, with its principal place of business in Chicago, and is engaged in the manufacture of transmission machinery. The interstate character of the Company's business is admitted, and the jurisdiction of the Board is not questioned. The sole question before us is whether the Board's order is supported by substantial evidence.

The Board's order found the Company guilty of unfair labor practices, first, under Sec. 8(1) of the Act, 29 U.S.C.A. § 158(1), by reason of its interfering with, restraining and coercing its employees in their right to organize, as provided by Sec. 7 of the Act, 29 U.S.C.A. § 157; second, under Sec. 8(3) by discriminating in regard to the hire and tenure of employment of William T. Polston, thereby discouraging membership in the International Association of Machinists, District No. 8, affiliated with the American Federation of Labor, hereinafter referred to as the Union. Upon these findings the Board ordered the Company to cease and desist from these unfair labor practices.

The evidence most favorable to the Board shows that the Company never had any union organization activity about its plant until the fall of 1939. One William F. Coleman was secretary and vice president, and the executive officer actively in charge of the Company. Mr. Coleman enjoyed the confidence and the respect of the employees. He was absent from the Company's place of business for seven or eight days in the first part of November, returning to the plant on November 17, 1939, at which time he was advised that the plant was in a turmoil and there was much unrest, especially in the machine shop. He found numerous grievances of the men and among them hostility to the superintendent of the machine shop, one Bauman. The condition of unrest arose while Mr. Coleman was away. There had been prior at-

tempts by the employees to obtain raises in pay, but all had failed.

The employees being often thwarted in their endeavors to get attention paid to their grievances within the Company, began to look elsewhere. On November 9, 1939, William T. Polston, Norman Ebert and Joe Gora, employees of the Company, went "down to see the Union," and signed cards signifying their willingness to join the Union, and began soliciting other employees to join. Action of the Company was swift and pointed. Next day Polston was fired or laid off. He had been working for the Company between two and three years. When he got his pay, he received a pink slip, telling him he was "laid off" because of "unsatisfactory work." He had never had any complaints about his work before. When the foreman told him he was laid off, he said he was following orders, and that Polston could get a reference from him any time. The Union representatives took the matter up with Mr. Coleman on his return, and Polston was returned to work and paid for the time he had lost. The Board found that Polston's discharge was because of his Union activity, and that this discharge amounted to discrimination in regard to the hire and tenure of said Polston, thereby discouraging membership in the Union. The fact that Polston had never had any complaints about his work before and that his foreman told him he could always get a reference from him, the swiftness with which his discharge followed his affiliation with the Union, and the promptness with which he was restored to duty with back pay after the Union had presented his case, fully support the Board's finding that Polston was discharged because of his union activity, and this constituted discrimination in hiring and tenure within the meaning of Sec. 8(3). New York Handkerchief Mfg. Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 144–147; Montgomery Ward & Co. v. National Labor Relations Board, 7 Cir., 107 F.2d 555–560; National Labor Relations Board v. Vincennes Steel Corp., 7 Cir., 117 F.2d 169–173.

If matters had stopped there, the restoration of Polston might have seemed sufficient to entitle the Company to be absolved from its flagrant violation of the Act.

Matters did not stop there. Mr. Coleman had given hostages to peace, but he kept up his subtle campaign of effective

interference with the Union's efforts to organize the Company's machine shop. It may fairly be inferred that Mr. Coleman was not without knowledge in the art of dealing with labor unions, as the Company was a member of the National Metal Trades Association, and Mr. Coleman was a member of the Chicago branch committee. This Association's anti-labor union organization activities are so well known that they have been noticed by the Supreme Court. See National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368.

There had never been any union activity about the Company's plant. It blossomed forth November 9, 1939, and met a sudden response by the Company November 10 by the discharge of Polston. Coleman returned on November 17 and went immediately into action. He sent for three active workers of the Union, Ebert, Patoux, and Lemke, for a confidential talk. Before the men went to see Mr. Coleman, Bauman, the shop superintendent, said to Patoux: "I hear there is a union going on here or starting up here * * * I want to show you something before you start a union in here. The firm is losing money." He then gave to Patoux a slip of paper with figures on it showing the purported losses, and asked Patoux to show the boys around the plant these figures, and this Patoux did.

Within three days after his return, Coleman called a meeting of the employees of the whole plant, a thing that had not been done before in over five years, and told them the Company was losing money, the same message Patoux had been told by the shop superintendent to spread among the employees. In his speech to the employees, Coleman said: "If W. A. Jones Foundry and Machine Company *is to remain in business* we must meet the competition in our industry! This means that our product must be offered to our customers at a price which compares favorably with others. That, of course, means that materials *and wages must be in line*." (Italics ours.) That may all have been very true, but very startling is the exclamatory statement by Mr. Coleman: "If * * * (the) Company is to remain in business," etc. A word to the wise should be sufficient. The import of that statement was that the Company might have to close up. "* * * wages must be kept in line"—a subtle suggestion that wage increases should not be

considered. After emphasizing in this first meeting with the employees the fact that the Company was losing money, and that wages should be kept in line, Coleman later called the second meeting of employees to tell them the Company was going to give everyone a raise, and stated: "This Monday I secured the services of an outside organization to make an accurate, detailed and authoritative rating of the jobs in our plant." But when he testified before the Board he said: "We had been negotiating for sometime to put through this job rating system * * * We had all signed up for that in July * * *" The raise went into effect November 27. Coincidental therewith, an independent union, called the Machinists & Foundrymen's Labor Union, had been formed and accepted by the Company without question as to the number of members it had, and a wage increase was negotiated with it. This independent union had been permitted by the Company superintendent and the foremen, and the evidence shows without Coleman's opposition, to solicit membership on the Company's time, but the A. F. of L. union was forbidden to do so.

Thus we have the situation of the Company's chief executive officer telling its employees of the Company's financial embarrassment on November 20, and pointing out to them the necessity to keep wages in line if the Company was to stay in business, and on November 27, the Company had money for a wage increase, and a brand new independent union with which to negotiate the wage increase! It must be conceded that events were moving rapidly. From a bad financial situation on November 20 and a warning that wages were to be kept in line, the Company to November 27 had experienced a great change and suddenly found itself able to increase wages for everyone, and that it had conveniently at hand the favored independent union with which to negotiate the increase. · These acts of the Company were intended to influence the employees. The promptness with which the wage increase and old abandoned plans therefor were resurrected, followed a pattern of effective influence exerted upon the employees, and it may fairly be inferred that this was done to discourage the Union's organization. M. H. Ritzwoller Company v. National Labor Relations Board, 7 Cir., 114 F.2d 432, 435.

In the meantime, shop foremen, the superintendent, and on one occasion Mr. Coleman himself, kept putting pressure on the employees concerning their Union organization activity. Martin Byrns, an employee, was asked by his foreman on November 16 why he had joined the Union. Byrns answered the majority of the men had joined. To this, the foreman replied: "After you have been working here so many years, you should be loyal to us. You might get yourself in trouble. They might blacklist you." The foreman added that the Company belonged to the Metal Trades Association, and Byrns "would not be able to get a job in an open shop."

Coleman inquired of the three employees he called in on November 17: "Why couldn't we get together without outsiders coming in, and settle it ourselves." A reasonable suggestion, but nevertheless a clear stab at the Union. Coleman admitted he had a short conversation with Polston in December. Polston had testified that in this conversation, Coleman had asked him why he was pushing the Union, and stated it would do him more harm than good. When Coleman's counsel asked him if he had had such a conversation, Coleman's answer rather startled counsel:

"Q. Did you ask him (Polston) at that time why he was pushing the union? A. I think I did at that time.

"Q. What?"

At the second meeting of Mr. Coleman with the employees, a Union committeeman, Harvey Hess, asked: "If the shop went A. F. of L. would it hurt the Company?" To this, Mr. Coleman responded, maybe not in the first two or three months but eventually the Company would have to shut down. In other words, Mr. Coleman was saying if you don't want to hurt your Company, don't join the Union, that the Union would be bad for the Company. That may have been good or bad prophecy, but it cannot be denied it was calculated to influence, and we think can be fairly interpreted as intended to influence, the employees against the Union.

Hess had in the past received at the hands of W. A. Jones, the chief stockholder of the Company, a great kindness and humanitarian act that reflected great credit on Mr. Jones, whom we do not meet otherwise in this record. Hess had a son who was born a cripple. Mr. Jones heard about it and voluntarily offered to give five thousand dollars for the child's treatment. In any event, the child was sent to a hospital,

largely through Mr. Jones's generosity, and restored to almost normal condition.

Coleman sent for Hess and told him Mr. Jones was hurt because Hess had joined the Union without first talking to him about his grievances. Hess, not without gratitude to his generous benefactor, promptly responded and voluntarily posted a notice of apology on the Company bulletin board, apologizing to Mr. Jones for joining the Union without first talking to him, and withdrew from the Union. Hess called the notice to the employees' attention. Coleman commended Hess for his courageous action.

Gratitude is a worthy human attribute. This act of kindness merited the utmost gratitude. An appeal to Hess did not find him ungrateful. There can be no doubt that it was a powerful weapon to use and only a suggestion of the circumstance was all that was needed to get results. The suggestion was made and the result followed promptly.

At the middle of November, 1939, the Union had signed up 70 men out of a possible 100 in the machine shop. By the spring of 1940, the Union meetings were attended by only a handful, and by July, the Union ceased to meet at all. The Union had been defeated.

■ We think it clear that the activities of the Company officials, the superintendent, and the foremen, as above outlined, formed a pattern which outlined the Company's attitude toward the Union, and were intended to and did influence the employees in the free exercise of their right to organize, guaranteed them by the Act, and the findings of the Board to this effect are sustained by substantial evidence. H. J. Heinz Company v. National Labor Relations Board, 311 U.S. 514–520, 521, 61 S.Ct. 320, 85 L.Ed. 309; Montgomery Ward Company v. National Labor Relations Board, 7 Cir., 107 F.2d 555–558, 559; New York Handkerchief Mfg. Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 144–147; M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432–435.

■ It was the purpose of the Act to guarantee to the employees freedom from interference by their employers in the employees' efforts to organize and bargain collectively by representatives of their own choosing. Employee organization was a matter of concern of the employees. The employer has no more right to intrude himself into the employees' efforts to organize and select their representatives to represent them in collective bargaining than the employee would have to intrude himself into a stockholders' meeting to interfere with the election of the company's directors, who are after all the representatives of the stockholders for the purpose of collective bargaining for the stockholders in all transactions relating to the company's business. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1–33, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

In the instant case, it seems clear to us that the Company interfered and discriminated in violation of Secs. 8(1) and 8(3), respectively, of the Act, and the Board's order that the Company cease and desist from such practices was proper. National Labor Relations Board v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433–438; International Association of Machinists v. National Labor Relations Board, 311 U.S. 72–82, 61 S.Ct. 83, 85 L.Ed. 50.

It is decreed that an order be entered enforcing the order of the Board.